71614, 71713. NATIONAL BANK OF GEORGIA v. WEINER;
and vice versa.
(348 SE2d 492)

BEASLEY, Judge.

In 1976 Zagoria & Stoner, P. C., a professional corporation engaged in the general practice of law, opened at the National Bank of Georgia a commercial checking account designated as an escrow account, which it used primarily to deposit and disburse client funds in real estate closings. The opening sheets indicated the nature of the professional corporation's business, including real estate closings, and specified as authorized signatures both Zagoria and Stoner. The account agreement neither identified the deposits as trust funds nor imposed a duty upon NBG to monitor the disbursement of the funds.

In October or November 1980, Zagoria began kiting checks between this escrow account and accounts at three other banks. Several times in late 1980, the NBG account went into overdraft status because NBG had paid on an uncollected funds basis checks written by Zagoria, only to have lenders' drafts which had been deposited in the account returned, payment refused. Zagoria made good these returned checks, either by having the bank redeposit the lenders' drafts or by depositing other lenders' drafts so the bank could charge back the amount paid out. In late September or October, NBG discontinued automatic overdraft privileges on this account and eventually closed it on November 26.

Back on August 26, Zagoria appeared at NBG with a check for $150,000 drawn on the Chase Manhattan Bank. He deposited $137,012.43 in the escrow account, purchased $10,974.23 worth of cashiers' checks payable to various persons, deposited $1,600 into his individual account, and obtained the balance of $413.57 in cash. Several days later the $150,000 check was returned payment refused. On September 8 the bank debited $150,000 from the escrow account, which then contained sufficient funds from other deposits to cover the charge back.

In late November several checks which had been deposited in the escrow account were returned payment refused, resulting in a total overdraft of $264,080. On November 25 the account had a collected funds balance of $7,324.55, and a check for $59,935.88 (drawn on another bank and payable to Dubose Enterprises, Inc. and Zagoria & Stoner) was deposited into the account. When the account was closed on November 26, the total collected balance of $67,260.43 was applied to the $264,080 overdraft. Some of the returned checks had been re-

deposited and eventually a total of $82,000 was paid, further reducing the overdraft amount to approximately $114,620. After the escrow account was closed, Zagoria submitted three checks (drawn to Zagoria & Stoner and other payees) totalling $114,070 to NBG, which applied them to the overdraft.

In January 1981 the Stewart Title Guaranty Company sued Zagoria and Zagoria & Stoner, P. C., alleging that Zagoria had converted trust funds. Beryl Weiner was appointed receiver for the professional corporation. The next January, Stewart Title and the St. Paul Title Insurance Company sued Zagoria, Stoner, and the receiver, alleging that Zagoria and Stoner, as agents of the title insurance companies, had failed to disburse loan funds properly. Thereafter, the receiver commenced this action against NBG, seeking recovery of the account funds that NBG had applied as set-offs against the account overdrafts. Subsequently, the receiver settled the claims against the professional corporation brought by the insurance companies and other parties.

NBG moved for summary judgment on the basis that it had had no knowledge that Zagoria had misappropriated trust funds. The trial court considered the receiver's response to that motion as a cross-motion for summary judgment and denied judgment for both parties. NBG brought this interlocutory appeal and Weiner cross-appealed.

## Appeal No. 71713

The receiver appeals from the denial of his motion for summary judgment against the bank for $264,070. He asserts that according to the undisputed facts, he is entitled to $114,070 which was credited by the bank to the customer's escrow account after it was closed. He further asserts that he is entitled to $150,000 which was treated by the bank as a chargeback to the account due to an earlier deposit's dishonor, both of which transactions occurred while the account was still open.

As to the $114,070, it is undisputed that after the customer was notified that there was a large overdraft in approximately this net amount (actually $114,620) due to returned checks and that the account was being closed by the bank, the customer delivered three checks totaling this amount. They contained the restrictive endorsement "Deposit Only" with the escrow account number. The bank did just that, applying the funds to the outstanding cash items which were created when the account was closed. This was in keeping with the normal pattern of transactions practiced by the bank and its customer while the account was open. The customer did not complain about the bank's application of the deposit to the cash items which represented the customer's debt to the bank. Only months later, when

the receiver was appointed, was the bank's action challenged, and that was by institution of this suit against it in April 1982.

The receiver, of course, stands in the shoes of the customer in pursuing this claim. "The general rule is that a receiver takes the rights, causes, and remedies which were in the individual or estate whose receiver he is, or which were available to those whose interests he was appointed to represent." 75 CJS 1000, Receivers, § 325. Accord *Hardwick v. Hook*, 8 Ga. 354 (2) (1850); *Crine & Daniel v. Davis*, 68 Ga. 138, 141 (1881).

Regardless of their source, that is, whether they originated as parties' funds or not, when they were delivered by the customer duly endorsed for deposit to the account which the customer knew was overdrawn in that amount, the bank did no more nor less than follow the customer's instructions in covering the cash items left by the net overdraft in that account. The customer even told the bank that this was the purpose for which the checks were being delivered. Moreover, this application of the deposit was a measure which the bank had a right to take. OCGA § 11-4-213 (5). The deposit of the customer simply constituted a discharge of the customer's debt.

The law specifically provides the bank with a right to charge back or obtain refund, OCGA § 11-4-212 (1), (3), (4), and (5), and to apply a deposit to an obligation of the customer, OCGA § 11-4-213 (5). These rights continue even if the "bank has purchased the item and is the owner of it." OCGA § 11-4-201 (1).

As to the $150,000, it is clear that the receiver is not entitled to summary judgment on any of it. Zagoria brought a check payable to himself as "Attorney at Law" to the bank. It is somewhat in dispute as to whether he deposited the whole amount into the corporation's escrow account and then made the several withdrawals leaving $137,012.43 on deposit, or whether he deposited only $137,012.43 into the account in the first place, in a split deposit by which not all of the check was deposited and some of it was used to purchase cashiers' checks, obtain cash, and deposited to his personal account. The vice president in the operations department, for example, testified in deposition that the check "was put in this account" but also that "It was $137,012.43 was [sic] deposited into the account." Further he said it was a check deposit and could not have been a cash deposit.

At any rate, the receiver did not establish any right as a matter of law to the $137,012.43 or to the $12,987.57 or to the whole amount of $150,000. When the check or part of it was deposited by the customer to the corporation's account, and it was returned dishonored, the bank had a right to charge back the amount of the credit given or obtain refund from its customer. OCGA § 11-4-212. We find no basis for the proposition advanced by the receiver that the chargeback could not be made from funds deposited by the customer which

originated in other real estate transactions. Nor do we find any legal obligation on the part of the bank to assure that the chargeback not be made with funds originating from third parties who are strangers to the dishonored check. The fact that it is an escrow account does not give rise to such a duty. The agreement between the depository bank and the customer made no provision for the bank to inquire as to the source of funds or to assure that funds deposited were applied to any particular purpose. The bank was entitled to rely on the presumption that the customer was acting lawfully with respect to the funds entrusted to it for the escrow account. See *Bank South v. Grand Lodge*, 174 Ga. App. 777, 780-781 (1) (331 SE2d 629) (1985). The record shows that the bank had no knowledge or notice of any wrongdoing by the customer's agent.

Furthermore, with respect to this chargeback as well as the application of the post-closing deposit, the customer did not complain. Thus the receiver is foreclosed, the bank not having been notified of an assertion of wrongful debit within a reasonable time. As said by the Kansas Court of Appeals in interpreting UCC § 4-406 (OCGA § 11-4-406), "it is clearly the intent of the law that a bank customer must exercise reasonable care and promptness in examining the statement of his account and in notifying the bank of improper debits and other discrepancies in the account." *Cairo Co-op Exchange v. First Nat. Bank*, 28 UCC Rep. 748 (1980).

While it is true that there were no statements of the account sent to the customer after the account was closed, showing the application of the three checks to the ending overdraft, the customer not only knew of it but directed it. As to the $150,000 debit, it was reflected on the then-active account statement sent to the customer, and no complaint ensued until the receiver challenged the bank's right to debit the account, well over a year later. The claim must be timely to have efficacy. OCGA §§ 7-1-352 (b); 11-4-406; *Horne v. C & S Bank*, 167 Ga. App. 187, 191 (305 SE2d 897) (1983).

Thus the court below was correct in denying summary judgment to the receiver.

### Case No. 71614

This leads to whether or not the bank was entitled to summary judgment. The lower court ruled that it was not, but we are persuaded that the bank was entitled as a matter of law to a conclusion of no liability, at least with respect to all sums except the $12,987.57. As to this sum, there is a factual dispute concerning its relationship to the escrow account which was charged with its non-collection.

On appeal, the bank enumerates as error the denial of summary judgment for it, on several grounds. Pretermitting the multi-faceted

question of whether the receiver has the right to bring the action, and assuming he did, the substantive bases for the bank's position have merit.

There is totally absent any evidence of knowledge by the bank that the three checks submitted by the customer's agent to cure the ending overdraft, or the split-deposited check applied by the bank to the $150,000 overdraft, constituted a misapplication or misappropriation of escrow funds by the customer's agent. The mere fact that this was an escrow account certainly raised no such knowledge. It was a general escrow account through which hundreds of checks passed in a short period of time, relating to a great many closings. There was no agreement between customer and bank that the funds deposited were limited to any particular transaction. Nor were the deposits themselves so limited by instructions thereon. When the deposits were made, they were the professional corporation's and not, insofar as the bank was concerned, the funds of some third party. Thus it was nothing more than an account against which the bank had a right of setoff. *C & S Nat. Bank v. Weyerhaeuser Co.*, 152 Ga. App. 176, 179 (1) (262 SE2d 485) (1979); *National Factor &c. Corp. v. State Bank*, 224 Ga. 535 (163 SE2d 817) (1968). In such circumstances, the bank was authorized to honor drafts on an uncollected funds basis. OCGA § 11-4-401 (1).

Secondly, the bank was authorized to apply the deposits as ordered by the customer's agent. OCGA § 7-1-352. As was said in *Trust Co. of Ga. v. Nationwide*, 235 Ga. 229, 230 (219 SE2d 162) (1975) with respect to the purpose of the substantially similar predecessor statute Code Ann. § 13-2042: "It is clear that the statute is designed to protect a bank from liability where an agent or fiduciary misappropriates funds of the owner in breach of his agency or trust without the bank's knowledge. The bank is not required to scrutinize every check written by a fiduciary or agent to see if the check is written in compliance with the agent's authority." See also *Bank South*, supra, with respect to the fairly correlative OCGA § 7-1-790.

Thirdly, the bank as a collecting bank was authorized to charge back, or obtain refund from its customer, for the amount of any credit given for an item which is dishonored. OCGA § 11-4-212; see *Pazol v. Citizens Nat. Bank*, 110 Ga. App. 319 (1) (138 SE2d 442) (1964).

Thus we reverse the denial of summary judgment in favor of the bank insofar as all but $12,987.57 of the funds are concerned. As to that amount, the facts are still in dispute.

*Judgment affirmed in Case No. 71713; judgment affirmed in part and reversed in part in Case No. 71614. McMurray, P. J., Birdsong, P. J., Carley, Sognier, Pope and Benham, JJ., concur. Deen, P. J., dissents. Banke, C. J., disqualified.*

DEEN, Presiding Judge, dissenting.

These cases cannot avoid having more significant impact upon the banking industry, out-of-state lending institutions making long term loans, real estate closing attorneys, borrowers, and consumers, as a practical matter than any case coming to this court in many years. That impact, however, as decided by the majority opinion will be turbulent, and I must respectfully dissent.

Resting quietly at the center of the maelstrom of issues and arguments propounded by the parties in these two appeals, the crucial issue simply is whether a bank, which has honored demands upon an escrow account in excess of the funds collected on that account, may thereafter without notice to anyone arbitrarily appropriate other trust funds earmarked for specific purposes, subsequently deposited into that account to repay itself for the loan made to the account by permitting the overdrafts. "It is well settled in this state . . . that unless funds deposited with a lending bank are in an account governed by an agreement which designates the funds as trust funds, or unless the lending bank by other means has actual knowledge that the funds deposited in a general account are intended to discharge a specific obligation or otherwise partake of the character of trust funds, then the funds are treated as any other general deposit funds, are commingled with other funds on deposit with the bank, and are subject to set-off against any matured indebtedness for which the bank is creditor to the principal. [Cits.]" *Cotton States Mut. Ins. Co. v. C & S Nat. Bank*, 168 Ga. App. 83, 87 (308 SE2d 199) (1983).

In the instant case, NBG actually *acknowledged* its general awareness that the escrow account contained trust funds, but emphasized that it did not (and had no duty to) monitor the specific deposits and thus did not know the specific obligation each deposit was meant to discharge. The bank's (and the majority opinion's) emphasis on the absence of any duty to monitor the individual deposits would be pertinent if this case concerned imposition of liability upon the bank for an improper disbursement of trust funds to a third party. See OCGA § 7-1-352, and *Bank South v. Grand Lodge*, 174 Ga. App. 777 (331 SE2d 629) (1985). However, it is inapposite here. As stated above, it has long been the rule in Georgia that a bank may not appropriate *known* trust funds to apply to the trustee/depositor's individual debt owing to the bank. *American Trust &c. Co. v. Boone*, 102 Ga. 202 (29 SE 182) (1897). A bank's general right to charge back, pursuant to OCGA § 11-4-212, does not alter this rule regarding known trust funds.

NBG had no right to apply trust funds earmarked for a separate independent loan to a different borrower, subsequently deposited to cure a debt arising from payment having been refused on other previously deposited, unrelated trust funds. There is no dispute that at the

time of the charge back for the $150,000 on September 8, 1980, the escrow account contained only funds unrelated to the credited but eventually dishonored deposit of August 26, 1980, and that the three checks totalling $114,070, submitted by Zagoria to the bank after the account was closed, were completely unrelated to the creation of the debt. The trial court should have granted partial summary judgment for Weiner for those identified misapplications of trust funds totalling $264,070. Weiner alleged a much larger sum of trust funds to have been similarly misapplied, but determination of NBG's liability for such additional amounts would remain for jury resolution. It follows that the trial court properly denied summary judgment for NBG.

The majority opinion is not unreasonable, but it ignores the law that a bank's right to charge back is not unlimited or blind, and the fact that NBG was aware that the account in question contained some trust funds. This writer's position actually would not place a greater burden upon a bank than previously imposed by the law; that is, where the bank has knowledge that deposits are third-party trust funds, it may not apply those funds to satisfy the account holder's individual debt to the bank. In the instant case, the pivotal fact is that NBG, *despite acknowledging its awareness that the account contained trust funds*, indiscriminately appropriated whatever funds existed in the account (or were tendered by Zagoria) to cure the individual debt owed it by Zagoria and Stoner. As a practical matter, my position and the law merely require a bank, possessing general knowledge that an account contains some trust funds, to find out whether the particular funds it seeks to appropriate via a charge back are in fact trust funds that belong to a third-party, else suffer liability for such misappropriation.

The practical, economic consequence of the majority opinion, however, could not be more pervasive in its chilling effect upon the industry's lending of money. How readily, for example, will an insurance company or a long-term lender now send money to our state and to a borrower's attorney to place in an escrow account under circumstances similar to these cases, *circumstances which are not uncommon*: (1) a long-term lender's draft issued to borrower and closing attorney deposited into the attorney's escrow account in a Georgia bank, supposedly to be disbursed upon closing; (2) the local bank is generally aware that trust funds are deposited in the escrow account; and (3) some individual debt of the depositor/attorney occasionally develops when a deposited draft is returned payment refused? How eagerly will a consumer attempt to borrow money with which to purchase a home, knowing that, after having signed the obligating documents and having granted a security interest in the property, the borrowed money deposited into the attorney's escrow account may be randomly seized by the bank in satisfaction of the attorney's unre-

lated, individual debt? How many attorneys will now feel safe in utilizing escrow accounts without the rigid requirement of disbursing loan proceeds with certified checks and bank money orders, and what other alternatives are available? These multiple and extensive problems are all made possible by the majority opinion, and all could be avoided simply by observing the law as discussed above.

DECIDED JULY 15, 1986 —
REHEARING DENIED JULY 31, 1986

*Donald J. Goodman, Robert S. Wayne*, for appellant.
*William R. King*, for appellee.