## A02A0533. BAKER et al. v. CAMPBELL et al.
(565 SE2d 855)

ELDRIDGE, Judge.

Richard S. Baker and Carolyn Baker contracted with J. William Campbell, Jr., individually and d/b/a Professional Contractors, Inc., to build a retirement home for them in Gilmer County. Gilmer County Bank made the construction loan to the Bakers for $225,000. Campbell and PCI went bankrupt prior to the completion of the house. Baker sued the Bank for fraud; he claimed that the Bank misled him into authorizing a draw on the construction loan at the Bank's request for payment to PCI's account with the Bank to pay suppliers and subcontractors. Instead, the Bank credited the $50,000 into the accounts of PCI and Beacon Sports Center, Inc., another business of Campbell's, and immediately attached the funds credited to such accounts to satisfy PCI's and Beacon's overdrafts of such amount of such separate corporations without paying the suppliers and subcontractors as represented. The Bank moved for summary judgment, which the trial court granted. We affirm in part and reverse in part.

---

The Bank provided separate corporate accounts for PCI and for Beacon, both separate corporate entities controlled by Campbell. However, there was no evidence in the record that Beacon was in anyway involved in or otherwise a party to performing the construction contract for the Bakers or was authorized by the Bakers to receive draws on the construction loan. Initially, PCI was required to make a draw request to Baker, who in turn authorized the Bank to pay PCI such sum; however, Baker was frequently out of state, which caused delays. Therefore, Baker and the Bank agreed to pay directly either Campbell or PCI from invoices and a draw request made by PCI, which required Baker's final approval. PCI was to pay the suppliers and subcontractors first from the draw payments before paying sums for its own use.

In November 1998, PCI made a request of Baker for a $90,000 payment which Baker authorized the Bank to make; however, the Bank refused to honor the draw, because the construction had not proceeded sufficiently to justify such a draw. Finally, the Bank approved a draw of only $20,000 after inspecting the work but continued to refuse other draws as requested by PCI and made with Baker's authorization. Subsequently, Baker obtained a separate construction loan from another lender to replace the Bank, because the Bank's restriction of the draws had delayed the construction.

In late 1998, the Bank's loan officer had numerous discussions with Campbell regarding the overdrawn business accounts of both PCI in the amount of $17,000 and Beacon in the amount of $33,000, which combined overdrafts totaled approximately $50,000. In hearsay, the loan officer claimed by affidavit and deposition that, at sometime prior to Campbell's injury and prior to the final disbursement of the $50,000 on February 1, 1999, Campbell instructed the Bank to place $33,000 from any draw in the account of Beacon and $17,000 into the PCI account; however, after Campbell was injured on January 25, the loan officer never spoke to Campbell prior to obtaining Baker's authorization to make such draw. The Bank was aware that Campbell and his separate corporate entities, PCI and Beacon, were in financial trouble and that there were unpaid suppliers and subcontractors on the Baker house project so that it refused further draws. Normally, the Bank allowed no additional draws without a contemporaneous inspection for progress, but it suddenly departed from this practice after Campbell's injury to allow the draw of $50,000.

On January 25, 1999, Campbell was disabled in a car wreck so that he could no longer conduct business. The Bank was aware of Campbell's injuries prior to asking Baker to renew his request for the $50,000 draw but never told Baker of Campbell's injuries and incapacity. On January 30, 1999, the president of the Bank ordered the

loan officer to contact Baker in New York on a Saturday where he was on business and have him authorize a request for an additional draw of $50,000 to pay suppliers and subcontractors to be made to PCI's account, which the Bank had consistently refused previously to make; also the president and loan officer discussed at that time between themselves the overdrafts with the Bank without revealing this information to Baker. Baker told the loan officer that he would authorize the draw only if such sums were used to satisfy outstanding supplier invoices and unpaid subcontractors on the job, and the loan officer assured Baker that such was the purpose for the draw and that such funds would be credited to the account of PCI for that purpose. The loan officer never revealed to Baker either prior to or after Baker approved the $50,000 draw that $33,000 was to be deposited to the Beacon account and that only $17,000 would be deposited to the PCI account. Then, the loan officer made the draw even though the house had not been inspected since 1998. The loan officer had Baker execute a waiver and release of lien form, which Campbell normally signed, because Campbell was physically unable to execute the forms. Prior to January 30, 1999, the Bank had in place on the PCI and Beacon accounts holds to catch any funds credited or deposited to such accounts. On February 1, 1999, the Bank credited the $50,000 draw to the accounts of both PCI in the amount of $17,000 and Beacon in the amount of $33,000. The loan officer never told Baker that he would credit $33,000 to the Beacon account. Immediately upon crediting these accounts, the Bank's hold attached such sums to satisfy the still outstanding overdrafts on such accounts so that now there were no funds to pay the suppliers and subcontractors in either account. Therefore, the Bakers had to satisfy the Bank's construction loan with another construction loan from a different lender which paid off the construction loan with the Bank, the unpaid construction liens of $50,000, and paid for the completion of construction.

1. The Bakers contend that the trial court erred in granting the summary judgment. We agree in part and disagree in part.

(a) From the record, Beacon had not been approved by or authorized by the Bakers to receive any draws on the construction loan at any time. In creating the construction loan and draws, neither the Bank nor PCI included Beacon among the authorized draw recipients. In obtaining Baker's request and authorization for the draw of $50,000, the Bank never obtained Baker's authorization to credit any of such funds to the Beacon account with the Bank. The Bank admitted that it had authority to disburse draws directly to Campbell, individually, or to PCI, but had no authority under the construction loan to pay such funds to a third party without the authorization of Baker. Thus, the Bank had no authority to divert any of the $50,000 draw on the construction loan for payment to the Beacon account. The Bank

knew that, under the written terms of the construction loan, draws were to be paid directly to Campbell, individually, or to PCI; Beacon was a legal entity not a party to the construction contract or construction loan. The only alleged authorization to divert the funds to the Beacon account came from the loan officer's statement that Campbell told him to do it; however, there was no evidence that Campbell had such authority, and the evidence showed only Baker had such authority to divert the funds. Further, such alleged authorization occurred prior to Campbell's injury, because the loan officer never talked to Campbell after his injury and the diversion of the funds to the Beacon account. Therefore, the loan officer's representation that the authorization by Baker for the draw against the construction loan of $50,000 would cause the Bank to credit PCI's account with such funds to pay suppliers and subcontractors could be considered by a jury to be a material misstatement of present fact and not a promise to be performed in the future, because a portion of such draw was unauthorizedly diverted to the Beacon account where such funds would be immediately attached by the Bank to satisfy the outstanding overdraft in such account. Thus, the statement that all the draw would go into PCI's account constituted a present statement of fact to the extent that a jury could find that the present fact was partially true that some part of the draw was paid to the PCI account and was partially false that some funds were diverted to the Beacon account by the Bank. Such facts create a material issue of fact for the jury's determination as to whether the statement was made fraudulently with scienter, to intentionally mislead the Bakers to their detriment, and to cause them harm by having them obligated to the Bank for such $50,000 on their construction loan, which was not used for their benefit but for the Bank's benefit instead.

Thus, in the record on the motion, whether the Bank had authority to divert funds to the Beacon account is in dispute between Baker's denial of the authority and the alleged disputed authority of Campbell to divert the funds, which creates a jury question. However, as to the fraud and deceit count, Baker testified that the Bank misled him by not revealing that it would divert part of the funds to the Beacon account and telling him that all the funds would be paid into the PCI account to pay debts. Therefore, it is irrelevant whether or not the Bank did or did not have authority to divert the funds, because the issue here is fraud and deceit.

Further, the Bank's motive in diverting the funds does not explain why it told Baker that the funds would be deposited to the PCI account to pay suppliers and subcontractors when the Bank presently intended to divert $33,000 to the Beacon account to cover the existing overdraft. Such alleged hearsay statement of Campbell neither proves that Campbell made it, that the statement made by

Campbell was true, nor that, if true, Campbell had authority to order the funds diverted without the Bakers' prior knowledge and approval. The essential elements of fraud and deceit are: (1) that the defendant made the representation; (2) that at the time he made the representation he knew the representation was false; (3) that he made the representation with the intention and purpose of deceiving the plaintiff to his detriment; (4) that the plaintiff reasonably relied upon such representations; and (5) that the plaintiff sustained loss and damages as a proximate result of such representation. *McLendon v. Galloway*, 216 Ga. 261, 263 (2) (116 SE2d 208) (1960).

As to the representations that the draw would be credited to PCI's account but was diverted instead to the Beacon account, this was not a future promise but a present misrepresentation of fact. While the promise to use the draw to pay suppliers and subcontractors might be considered to be a future promise by PCI or by the Bank, the misrepresentation that the funds would be paid to PCI's account, and the immediate diversion of funds into the Beacon account instead of all paid into the PCI account, was a present misrepresentation of fact by the Bank and not a future promise that it never intended to perform. *Goodlett v. Ray Label Corp.*, 171 Ga. App. 377, 378-379 (1) (319 SE2d 533) (1984); see also *Middlebrooks v. Lonas*, 246 Ga. 720, 721 (2) (272 SE2d 687) (1980). The Bank's actions in diverting only sufficient sums to satisfy the overdraft of each account; in creating the attachment on each account; in failing to advise of the overdrafts, preexisting attachment, Campbell's alleged instructions, and Campbell's injury; in urgently contacting Baker in New York on a Saturday; and in having Baker execute the lien waiver forms are all facts under the totality of the circumstances giving rise to the inference of fraud. *Hines v. Good Housekeeping Shop*, 161 Ga. App. 318, 319 (3) (291 SE2d 238) (1982). Thus, a jury issue was presented, requiring reversal. *Blanchard v. West*, 115 Ga. App. 814, 815 (2) (156 SE2d 164) (1967); *Norris v. Hart*, 74 Ga. App. 444, 446 (40 SE2d 96) (1946).

The grant of summary judgment as to fraud regarding the diversion of $33,000 to the Beacon account is reversed, because the Bank violated its duty to pay such funds either to Campbell directly or to PCI as it had represented to the Bakers that it would do. Through what a jury could find to be fraud, the misrepresentation by the Bank led Baker to consent to the authorization of the payment of such funds to PCI, which the Bank then diverted to the Beacon account. Such conduct occurred within the internal operations of the Bank outside the supervision and control of Baker for the Bank's own benefit. Therefore, a jury could find that the Bank failed in its duty of ordinary care to insure that the labor and material claims were paid from such funds because the Bank diverted internally such funds

into an account where it had the right to attach Beacon's funds and because the only way that the Bakers could protect themselves from the Bank was to receive the draw directly and pay the lienholders directly, which would have been a departure from the construction loan agreement.

(b) Under the construction loan agreement, the Bank had a duty to pay upon Baker's request, a draw directly to Campbell, individually, or to PCI and only to such individuals and entities. On January 31, 1999, the payment on Baker's authorization and instruction of $17,000 to PCI's account complied with such express terms of the loan agreement. Therefore, the Bank had no liability to the Bakers for what it had a legal right to do under the Bakers' draw authorization, which was to attach the funds deposited to the PCI account to satisfy the preexisting overdrafts owed to the Bank in such account. OCGA §§ 11-4-215 (f) (formerly OCGA § 11-4-213 (5)); 11-4-401 (a); *Nat. Bank of Ga. v. Weiner*, 180 Ga. App. 61, 63 (348 SE2d 492) (1986); *Cohutta Banking Co. v. Home Fed. Sav. & Loan Assn. &c.*, 188 Ga. App. 317 (372 SE2d 689) (1988); *Fed. Deposit Ins. Corp. v. West*, 244 Ga. 396, 399 (260 SE2d 89) (1979).

> Moreover, this application of the deposit [(to cover the overdraft)] was a measure which the bank had a right to take. OCGA § [11-4-215 (f)]. The deposit of the customer simply constituted a discharge of the customer's debt. The law specifically provides the bank with a right to charge back or obtain refund, OCGA § 11-4-212 (1), (3), (4), and (5), and to apply a deposit to an obligation of the customer['s debt].

*Nat. Bank of Ga. v. Weiner*, supra. Thus, the Bank's actions constituted a legal practice in using the Bakers' credit to deposit a loan draw to the builder's overdrawn account to satisfy the debt to the Bank of the builder caused from overdrafts, even though they were not shown by competent evidence to be related to such home construction.

The Bank induced Baker to draw against his construction loan and to credit such funds to PCI's account so that such funds became subject to attachment to satisfy the outstanding overdraft on such account, and Baker believed that such funds would be used to satisfy outstanding suppliers' and subcontractors' liens. Such conduct by the Bank was neither a breach of contract nor tortious. *First Ga. Bank v. Webster*, 168 Ga. App. 307, 309 (2) (308 SE2d 579) (1983). The Bank as lender and the Bakers as borrowers had no fiduciary relationship and dealt at arm's length. *Pardue v. Bankers First Fed. Sav. &c. Assn.*, 175 Ga. App. 814, 815 (334 SE2d 926) (1985).

The primary duty of a lending bank is to protect the assets of its members or depositors and not to protect the assets of its borrowers.

*Lothridge v. First Nat. Bank &c.*, 217 Ga. App. 711, 715 (5) (458 SE2d 887) (1995); *Butts v. Atlanta Fed. Sav. &c. Assn.*, 152 Ga. App. 40, 42-43 (262 SE2d 230) (1979). The construction lender has no independent duty either in tort or contract to the borrower to protect him from problems with the builder's work, construction defects, or liens for labor and materials. *Constr. Lender v. Sutter*, 228 Ga. App. 405, 409-410 (2) (491 SE2d 853) (1997); *Butts v. Atlanta Fed. Sav. &c. Assn.*, supra at 42. It is the borrower's responsibility to insure that payments for labor and materials are made from any draw, and such duty is not shifted to the lender from the loan agreement alone, absent specific contractual obligations to do so for the benefit of the borrower rather than the lender's own protection. *Peterson v. First Clayton Bank &c. Co.*, 214 Ga. App. 94, 99-100 (1) (447 SE2d 63) (1994). When the lender agrees to pay the builder directly by a draw, the homeowner still has the duty to insure that labor and materials are paid; however, the lender may be liable for unauthorized payments outside the loan agreement's express terms. *First Fed. Sav. Bank &c. v. Fretthold*, 195 Ga. App. 482, 484-485 (394 SE2d 128) (1990). However, the lender can expressly agree by written contract to undertake the obligations of the borrower to monitor payments for labor and materials, which would obligate it to do so. *Harden v. Akridge*, 193 Ga. App. 736 (389 SE2d 6) (1989). Likewise, the lender by express written contractual obligations in the construction loan agreement could obligate itself to perform construction inspections not only for its benefits but also for the benefit of the borrower. *Butts v. Atlanta Fed. Sav. &c. Assn.*, supra. However, such contractual obligations did not exist in this case. Further, in this case, the foregoing cases have no legal or factual application, because in those cases the builder, not the lender, was the entity that caused the construction funds to be used for a purpose other than payment of suppliers or subcontractors; also in this case, the builder did not fail, refuse, or divert to its own use the draw that was supposed to pay the suppliers and subcontractors with such funds. The Bank legally, as a matter of electronic bookkeeping, seized the money as soon as it credited the funds to the builder's account after first crediting and debiting such amount to the homeowner's construction account so that the Bakers became obligated to pay such sums even though the funds were never used for the purpose under the construction loan. OCGA §§ 11-4-215 (f); 11-4-401. Thus, the borrower did not fail to insure that the builder paid the draw proceeds to satisfy liens of suppliers or subcontractors, because the builder never gained actual or constructive control of such funds. The Bakers failed to protect themselves from their own lender as the creditor of their builder. The Bank created its money trap after shooing the Bakers into it, which caught the draw funds in the nanosecond that the Bank electronically credited such

draw to the PCI account ahead of all other possible creditors and which draw went to immediately satisfy the pre-existing $17,000 overdraft that the Bank allowed PCI to create in such account, knowing that the Bank was protected by its own scheme.

The Bakers' failure of reasonable care, if any, was to protect themselves from the Bank, their lender, in the terms and conditions of the construction loan that was negotiated at arm's length long before this seizure of the draw. In the construction loan, the Bakers should have required all draws to have been paid into a trust or escrow account for the builder that would require draws to be paid for labor and materials free from the reach of all creditors, either the Bank, itself, or others. However, such escrow account would not have protected the Bakers from the conduct of either PCI or Campbell in failing to pay, nor would it create liability for the Bank for failing to supervise the builder's distribution from an escrow account. *Nat. Bank of Ga. v. Weiner*, supra at 65. Therefore, the Bakers could have created their own construction escrow account and issued checks jointly to the builder/supplier, to the builder/subcontractor, or to the builder, which would have been the only way that they could protect themselves from the lender, builder, and lienholders at the same time.

The Bank was entitled to summary judgment as to the $17,000 paid into the PCI account, which it legally seized, because it violated no legal duty in this transaction; therefore, we affirm.

(c) Since the claim of actual fraud constitutes an intentional tort to cause harm under OCGA § 51-12-5.1 (b), then such is not a contract claim, allowing the recovery of punitive damages in an amount subject only to constitutional due process limitations for the aggravated circumstances to penalize, punish, and deter the Bank from future similar conduct. *Speir v. Krieger*, 235 Ga. App. 392, 402 (5) (509 SE2d 684) (1998). Thus, a jury issue exists, because the record contains facts from which a jury could find by clear and convincing evidence that punitive damages are authorized. *McDaniel v. Elliott*, 269 Ga. 262, 264-265 (2) (497 SE2d 786) (1998). Therefore, the grant of summary judgment as to this issue is also reversed.

2. The Bakers contend that the trial court erred in determining that no duty existed between the Bank and the Bakers. Division 1 controls this enumeration of error.

*Judgment affirmed in part and reversed in part. Smith, P. J., and Ellington, J., concur.*

DECIDED MAY 23, 2002 — ▮▮▮▮▮▮▮

*Ray & McKinney, Robert M. Ray, Jr.*, for appellants.

*Thompson, O'Brien, Kemp & Nasuti, Paul J. Morochnik, Bret T. Thrasher*, for appellees.