A02A1505. MUSTAQEEM-GRAYDON et al. v. SUNTRUST BANK et al.
(573 SE2d 455)

BARNES, Judge.

This appeal addresses the issue of whether a bank properly paid out funds from a construction loan to a contractor, and for the reasons that follow, we affirm the trial court's grant of summary judgment to the bank.

Wiley Karriem Mustaqeem-Graydon IV ("Graydon") and the Mustaqeem-Graydon Conservatory of Music, Inc. ("Conservatory")

---

sued LRA Constructors, Inc. ("LRA") and SunTrust Bank and its parent company, SunTrust Banks, Inc., in a multi-count complaint regarding a project to buy and renovate a building. LRA answered and counterclaimed for money owed on the construction contract. SunTrust Bank answered and counterclaimed for money due on a construction loan and an overdrawn checking account. SunTrust Banks, Inc. answered and denied having participated in any of these transactions.

Both banking entities moved for summary judgment. SunTrust Banks, Inc. moved for judgment on Graydon's complaint against it on the ground that it was not a party to these transactions. SunTrust Bank moved for summary judgment on its counterclaim for $310,000 principal plus interest, late charges, and attorney fees due on a construction loan to Graydon, and on its counterclaim for a $6,025 overdraft in Graydon's construction loan checking account. Additionally, SunTrust Bank moved for summary judgment on the five counts Graydon brought against it: breach of contract; negligent disbursement of construction loan proceeds; fraud; negligent misrepresentation; and conspiracy. Following a hearing, the trial court granted summary judgment to SunTrust Bank on its counterclaim for the note and overdraft, and granted summary judgment to both banking entities on Graydon's complaint against them. Graydon appeals.

This appeal does not involve Graydon's claim against his contractor, LRA, or its counterclaim against Graydon, and we will not consider those parties' competing testimony regarding whether the terms of their contract changed during the course of the renovation or whether the work was done properly. The trial court's well-reasoned order describes the lengthy facts and issues in this case between Graydon and SunTrust, and we will paraphrase from it liberally.

Graydon owned and operated a music school in Albany, the Mustaqeem-Graydon Conservatory. In December 1997, he began considering a plan to expand the business. Initially, he wanted to build a new conservatory building, but could not obtain the necessary financing. He then began to consider renovating an existing structure. In seeking to acquire and renovate an existing structure, Graydon sought the expertise of real estate agent Mary Carter, who suggested he consider the Security Bank & Trust Building. By fall 1998, Graydon had decided to try to buy and renovate the old building. Carter also suggested that Graydon consider using LRA to renovate the building. Graydon asked Ben Barrow of LRA and another company to prepare bids for the proposed renovations and began negotiating with the property owner to buy the building. He was unable to obtain financing from the owner or any of the local banks, but Barrow said he would try to put together a package with SunTrust Bank and the

City of Albany Economic Development Commission. In March 1999, Graydon contracted to buy the property for $260,000. The City agreed to loan $200,000 toward the property acquisition, and Sun-Trust agreed to loan $310,000 for the rest of the purchase price and renovations. Graydon contracted with LRA to renovate the building for approximately $280,000 and planned to raise the additional $30,000 to $40,000 he still needed to meet his contractual obligations with LRA.

SunTrust's loan commitment letter, which Graydon and bank representative Bubba Scott signed, contains the following merger clause:

> This commitment supersedes all prior discussions and agreements by and between the Borrowers and SunTrust with respect to the loan in all matters contained herein; this commitment contains the sole and entire understanding between the parties hereto with respect of the loan. This commitment shall not be modified or amended except by instrument in writing executed in the name of and by an officer of SunTrust.

The draw note Graydon signed states that the borrower was entitled to draw under the note under the condition that "disbursements will be made at the sole discretion of the Lender unless the Lender has otherwise specifically made a legally binding commitment to make disbursements hereunder." The Conservatory signed a guaranty agreement, agreeing to be liable for Graydon's debts to the bank.

The initial draw on the construction note was for $62,423, the remainder of the acquisition price, and Graydon does not contend that this draw was unauthorized. Following that, eight draws were made from the note and deposited into Graydon's construction checking account, including one for $36,000 following LRA's first bill for $35,635. Graydon testified that, after the $36,000 deposit was made, but before LRA was paid, he expressed his dissatisfaction with LRA's progress to Scott at SunTrust and mentioned that he was considering withholding payment. Scott explained that if Graydon did not pay the bill, LRA could walk off the job and put a lien on the property. Sometime shortly thereafter Graydon wrote a check to LRA from another account in full payment of this bill, but the check bounced.

Graydon then paid LRA $30,000 via cashier's check drawn on the other bank, and LRA contacted Scott to discuss arrangements for a more secure form of payment. It asked Scott to deposit payment of its future bills from the draw account directly into LRA's account, but Scott told them Graydon would have to approve such an arrange-

ment. Shortly thereafter, on June 2, 1999, Graydon signed and faxed the following memo to Scott:

> In view of my agenda and other responsibilities, LRA (Glen Pinkston), and myself[ ] came to a reasonable agreement which verbally stated that after I purchase the first set of doors, all other orders/special orders will be purchased by LRA (Glen Pinkston). We acknowledge that more money will be required due to the construction[;] therefore, we are raising more money to deposit into the construction account. All other drawings for construction will be made by LRA (Glen Pinkston). I will keep in contact with you Mr. Bubba Scott and Glen Pinkston for more up-date concerning this project.

LRA faxed its second bill of approximately $26,000 to Graydon on June 15, 1999, with a cover page stating, "As we have discussed previously Bubba Scott will issue a joint check on all future pay requests. (see attached request) I would like to meet with you and Bubba 6/16/99 at 10:30 am if you and Bubba can meet at that time." Graydon, LRA, and Scott subsequently met in Scott's office to discuss the bill. Graydon testified that he had no opportunity to review the bill and did not object to making a general ledger debit or electronic funds transfer directly from his loan into LRA's account at SunTrust because he thought the transfer had already been completed. Graydon further testified that Scott was well aware that he was unhappy about the payment having been made.

A couple of weeks after this meeting, on June 30, 1999, Graydon faxed Scott the following memo:

> This memo is in reference to the outstanding balance of $6,000.00 [in the construction checking account]. Please just draft that amount from our construction line[;] all funds were used for improvements. I am also making a formal request for you to close my checking account[;] since all construction invoices, bills of sale, and proposals of work will be sent to LRA for approval and expenditure, there is obviously no need for me to have a checking account for construction. I have also sent a letter to Mr. Glen Pinkston requesting that upon your approval of the monthly invoices, electronic funds transfer (EFT) be made as was done last month[;] it seemed to be more convenient for everyone. Thank you for your time and consideration and if there [are] any questions concerning this matter, please feel free to contact me by fax or phone. Have a *musical* day!

Graydon sent a similar memo to LRA:

> This memo is in reference to the outstanding balance of $5,635.00[, from the first bill]. Please just include that amount with the next billing cycle that your company invoices to us. I have also informed [a subcontractor] that all future invoices for travel, design, and wiring be sent to you. As keeping in form with our previous agreement, all construction invoices, bills of sale, and proposals of work, I am directing to you for approval and expenditure. I have also sent a letter to Mr. Bubba Scott requesting that my construction account be closed, and requested that from this time present, upon approval of the monthly invoices, electronic funds transfer (EFT) be made as was done last month. Thank you and if there [are] any questions concerning this matter, please feel free to contact me by fax or phone. Have a *musical* day!

On July 1, 1999, Graydon, LRA, and Scott met again, and LRA presented its third bill for payment, which exceeded the $41,064.16 remaining on the construction draw note. Graydon initialed the commercial loan advance form before SunTrust transferred the remainder of the loan funds to LRA's account.

Finally, Graydon sent the following memo to Scott on July 27, 1999:

> This is a memo confirming our intention to live up to the obligation we have to you and SunTrust. As you may well know, we have been highly dissatisfied with how construction has taken place, and the numerous items that we have paid for that are either incomplete or poorly done. However, this does not remove us from our obligation on our note with you. If you would please work with us, since we do not have any facilities to support our debt, we are forced to look for alternate means of paying bills. It may take me a little time, but we *are* going to take care of our interest obligation. I am terribly sorry that we were not able to meet the deadline of last Friday[;] I started teaching students again myself, as a means of extra income, trying to accomplish that goal, but was unsuccessful. We are persistent and will catch all payments up. Thank you for your time and consideration. Mr. Scott, if you would send me a copy of the LRA contract from your file, I would appreciate it. Thanks incontinent [sic] advance and have a musical day!

Graydon also admitted at deposition that the draw note had matured and that none of the principal and interest due had been paid. An attorney's affidavit establishes that the bank sent Graydon and the Conservatory written notice declaring their default and informing them that SunTrust would seek 15 percent attorney fees should the balance remain unpaid.

Additionally, Graydon's construction checking account at Sun-Trust was overdrawn in the amount of $6,000, plus fees and interest. Graydon was the sole authorized signatory on the account.

1. In order to prevail at summary judgment under OCGA § 9-11-56, the moving party must demonstrate that there is no genuine issue of material fact and that the undisputed facts, viewed in the light most favorable to the nonmoving party, warrant judgment as a matter of law. *Lau's Corp. v. Haskins*, 261 Ga. 491 (405 SE2d 474) (1991).

2. First, Graydon has pointed to no evidence of record showing that the corporate entity SunTrust Banks, Inc. was a party to the transactions at issue. While he contends in his brief that "the record clearly shows that both the Defendant Banks, including [SunTrust Banks, Inc.], executed the Note," he makes no citation to the record. Our review of the "Commercial Fixed Rate or Revolving Draw Note" at issue here uncovers no reference to SunTrust Banks, Inc., only to SunTrust Bank, the note holder. The trial court did not err in granting summary judgment to SunTrust Banks, Inc.

3. As the trial court pointed out, Graydon's complaint against SunTrust Bank is based on the manner of its last two disbursements to LRA, which he contends were made without his consent. In moving for summary judgment, SunTrust made a prima facie showing that there is no genuine issue of material fact and that the undisputed facts, viewed in the light most favorable to Graydon, warrant judgment as a matter of law. The faxed memos giving the bank authorization to disburse the funds were not made under oath, and therefore we cannot construe against him Graydon's testimony that he must have meant LRA would provide physical drawings of the project rather than obtain money draws. *Shiver v. Norfolk-Southern R. Co.*, 269 Ga. 168, 169-170 (496 SE2d 903) (1998). This testimony, however, does not establish the existence of a genuine issue of material fact, as Graydon does not contend that he did not send the faxes authorizing the bank to disburse funds to LRA in its discretion, nor does he contend that he withdrew those authorizations. The trial court did not err in granting summary judgment to SunTrust on Graydon's breach of contract claim.

Graydon contends the contract is ambiguous and parol evidence should be considered to determine its terms, and argues further that part performance removed the agreement from the writing require-

ment of the statute of frauds. We find nothing ambiguous about the clause providing that "disbursements will be made at the sole discretion of the Lender unless the Lender has otherwise specifically made a legally binding written commitment to make disbursements hereunder." Further, just because the bank issued the first draws per Graydon's request did not mean it was contractually required to make all draws pursuant only to Graydon's request. The evidence shows that Graydon sent multiple memos first directing the bank to issue funds on LRA's approval and then affirming his agreement with these actions afterward, evidence that this Court must consider rather than Graydon's contradictory deposition testimony that the bank knew he did not want to pay LRA. These memos establish the bank's defense against these claims, which Graydon has not rebutted.

4. Graydon next asserts that the bank is liable for negligent inspection of the renovation work and negligent disbursement of funds to LRA. Ordinarily, an action for damages by a property owner against a lender for negligent inspection will not lie, because the lender's inspection is normally not made for the owner's benefit, but for the lender's protection and benefit. *Jordan v. Atlanta Neighborhood Housing Svcs.*, 171 Ga. App. 467 (1) (320 SE2d 215) (1984). We have recognized an exception "when the lender's financing activity extends beyond that of a conventional construction lender" which may generate a legal duty to protect the homeowner from damages caused by construction defects. (Citations and punctuation omitted.) Id. at 467-468.

In *Jordan*, the lender's representative possessed specialized competence in home renovation, undertook to inspect the home in response to the owner's complaints, and knew about defects in the renovation. Id. at 468. Nothing in the record in this case, however, supports Graydon's contention that SunTrust undertook to inspect the quality of LRA's work on Graydon's behalf before disbursing funds to LRA, other than Graydon's testimony that Scott said he would visit the job site and "make his presence known as the lending institution, you know, that they needed to do right." Scott testified that, while he verifies that work is being performed on renovation projects, he does not determine work quality because he is not qualified to do so. Further, as discussed previously, Graydon directed SunTrust in writing to disburse the funds directly to LRA, which is inconsistent with his claim of negligent disbursement. The trial court did not err in granting summary judgment to SunTrust on this count.

5. Graydon contends that a jury issue exists as to whether SunTrust is liable for fraud and negligent misrepresentation related to the bank's disbursement to LRA on its second draw of $26,012.50,

asserting that Scott falsely or negligently misrepresented that it would disburse the funds only with Graydon's approval.

"The tort of fraud has five elements: a false representation by [the] defendant, scienter, intention to induce the plaintiff to act or refrain from acting, justifiable reliance by the plaintiff, and damage to the plaintiff." (Citation and punctuation omitted.) *Eason Publications v. Nationsbank of Ga.*, 217 Ga. App. 726, 730 (3) (458 SE2d 899) (1995). Graydon authorized the bank in writing to fulfill LRA's draw requests by electronic funds transfer, which is what the bank did. "Therefore, the Bank had no liability to [Graydon] for what it had a legal right to do under [Graydon's] draw authorization." *Baker v. Campbell*, 255 Ga. App. 523, 528 (1) (b) (565 SE2d 855) (2002). The trial court did not err in granting summary judgment to SunTrust on Graydon's claim of fraud and negligent misrepresentation.

6. Finally, Graydon contends that the bank conspired with LRA to defraud him. "A conspiracy is a combination of two or more persons to accomplish an unlawful end or to accomplish a lawful end by unlawful means." (Citation and punctuation omitted.) *First Fed. Sav. Bank v. Hart*, 185 Ga. App. 304, 305 (2) (363 SE2d 832) (1987). To recover damages for a civil conspiracy claim, a plaintiff must show that two or more persons, acting in concert, engaged in conduct that constitutes a tort. *Savannah College of Art &c. v. School of Visual Arts &c.*, 219 Ga. App. 296, 297 (464 SE2d 895) (1995). "Absent the underlying tort, there can be no liability for civil conspiracy." *O'Neal v. Home Town Bank &c.*, 237 Ga. App. 325, 330 (4) (514 SE2d 669) (1999). In this case, because Graydon's underlying fraud claim fails, he cannot maintain a cause of action for conspiracy to defraud him. *Association Svcs. v. Smith*, 249 Ga. App. 629, 638 (11) (549 SE2d 454) (2001).

7. SunTrust established without contradiction that Graydon signed the draw note, that all of the money had been paid out, that the note had matured, that none of the principal and interest due had been paid, and that the Conservatory guaranteed Graydon's debts. The record also establishes without contradiction that the bank sent Graydon and the Conservatory written notice declaring their default, and claiming 15 percent attorney fees should the balance remain unpaid. Likewise, SunTrust established without contradiction that Graydon's construction checking account was overdrawn and that he was liable for it. Because the bank was entitled to summary judgment on Graydon's claims of breach of contract, negligent disbursement, fraud, and conspiracy, as discussed previously, the trial court did not err in granting summary judgment to the bank on its counterclaims for money due under the note and the overdrawn account.

*Judgment affirmed. Ruffin, P. J., and Pope, Senior Appellate Judge, concur.*

DECIDED OCTOBER 30, 2002.

*Roosevelt Carter II, Larry E. Givens,* for appellants.
*Hodges, Erwin, Hedrick & Coleman, William A. Erwin, Gardner, Willis, Sweat & Goldsmith, Donald A. Sweat,* for appellees.