Hamid LAVASSANI, Blue Sea Petro, Inc., and Lavassani Properties, LLC, Plaintiffs,

v.

CITY OF CANTON, Georgia, Jeff Lance, Todd Vande Zande, Lamar Jones, Dan Combs, Rodney Campbell, Jason Yarbrough, and John Does numbered 1 through 5, Defendants.

Civil Action No. 1:08–CV–3065–CAP.

United States District Court, N.D. Georgia, Atlanta Division.

Aug. 20, 2010.

Frankie L. Fulton, Henry Brian Sams, Laurel Elizabeth Creek, Sams & Cole, LLC, Marietta, GA, for Plaintiffs.

David G. Archer, Office of David G. Archer, Cartersville, GA, Althea S. Prince, Harvey Scott Gray, Monica L. Wingler, Gray Rust St. Amand Moffett & Brieske,

Atlanta, GA, James Richard Westbury, Jr., Matthew Herbert Bennett, James R. Westbury, Jr., P.C., Griffin, GA, for Defendants.

## ORDER

CHARLES A. PANNELL, JR., District Judge.

This matter is before the court on the following: Rodney Campbell's motion for summary judgment [Doc. No. 66]; Lamar Jones's motion for summary judgment [Doc. No. 69]; City of Canton, Georgia, Jeff Lance, and Todd Vande Zande's (collectively "City defendants") motion for summary judgment [Doc. No. 74]; Daniel Combs's motion for summary judgment [Doc. No. 75]; and Jason Yarbrough's motion for summary judgment [Doc. No. 76].

## I. Factual Background [1]

This lawsuit was filed as a result of a series of events involving the plaintiffs and members of Canton Police Department ("CPD") in Canton, Georgia. The plaintiffs are Hamid Lavassani, a United States citizen of Iranian descent and a Cobb County, Georgia resident; Blue Sea Petro, Inc. ("Blue Sea"); [2] and, Lavassani Properties, LLC ("LP"). [3] The defendants are the City of Canton, Georgia; Jeff Lance, the CPD Chief of Police; Todd Vande Zande, the CPD Assistant Chief of Police; Lamar Jones, a law enforcement officer with the CPD; Rodney Campbell, a law enforcement officer with the CPD; Daniel Combs, a law enforcement officer with the

---

1. All evidence and factual inferences are viewed in the light most favorable to the plaintiff, the non-movant. *Johnson v. Clifton,* 74 F.3d 1087, 1090 (11th Cir.1996).

2. Lavassani is a shareholder, director, and officer of Blue Sea, which owns the Shell station involved in this lawsuit.

3. Lavassani is a member and officer of LP, which owns the land on which the Shell station is located.

CPD; and Jason Yarbrough, a law enforcement officer with the CPD. The events occurred during the final hours of May 1, 2008, and early morning hours of May 2, 2008.

## A. Armed Robbery at Alexander Ridge Apartments

On May 1, 2008, sometime after 11:00 p.m., CPD Officers Daniel Combs and Jared Jordan responded to an armed robbery at the Alexander Ridge Apartments, located in Canton, Georgia. Upon arrival at the crime scene, the CPD officers questioned the white, male victim and learned that three young, black males had robbed him at gun point and stolen a cell phone, some cigarettes, and two dollars. Additionally, the police learned that the perpetrators had been seen at the nearby Shell station earlier that evening.[4] In response to the information gathered at the crime scene, the police decided to send someone to the Shell station to question the store clerk.

## B. The Shell Station[5]

At approximately 11:31 p.m., an unidentified CPD officer entered the Shell station to question the store clerk, Dagnachow Tamene Woldeyohanes, as to whether Woldeyohanes had "seen three black guys." Woldeyohanes stated that he had seen three black guys approximately "two hours ago" and then provided a description of the clothes they had been wearing. In addition, upon inquiry from the unidentified officer, Woldeyohanes confirmed that the Shell station had a surveillance camera that had been working while the three men were inside the store. In response, the unidentified officer told Woldeyohanes to "hold that tape" because the three black males had "just committed an armed robbery." Then, as he departed the Shell station, the unidentified officer initiated a radio call.

### 1. Initial Effort to Obtain the Videotape

At 11:34 p.m., Sergeant Lamar Jones of the CPD entered the Shell station to inquire about the surveillance cameras and obtaining the videotape. Upon learning that there was a videotape but Woldeyohanes could not access them, Jones stated multiple times that he "need[ed] the video tonight" and directed Woldeyohanes to call his manager and tell the manager that "the police are up here and we need the video." Woldeyohanes complied with Jones's directive, but his manager, Hamid Lavassani, did not answer the store clerk's call.

After not answering the initial call to his cell phone,[6] Lavassani called the Shell station at 11:37 p.m. and first spoke with Woldeyohanes and then Jones. When Jones spoke with Lavassani, Jones explained the events regarding the armed robbery and his need to access the videotape from the store. In response, Lavassani stated that it was late at night, he was asleep, and he would happy to provide the

---

4. The Shell station is located in close proximity to the Alexander Ridge Apartments.

5. Unless otherwise specified, all of the facts, quotes, and times regarding the events occurring inside the Shell station, between 11:30 p.m., May 1, 2008, and 1:00 a.m., May 2, 2008, are based upon the videotapes from Camera 5 inside of the store [Doc. No. 84, Pls.' Exs. 1 and 2].

6. Lavassani and his wife, Leyla, were asleep in their bedroom on the second floor of their home at the time of the initial call to his cell phone, which was located on the first floor. [Doc. No. 81, Lavassani Dep. pp. 22–23]. However, Leyla heard the phone ring and went downstairs to determine who had called. *Id.* Upon learning that it was a call from the Shell station, Leyla alerted her husband. *Id.*

videotape when he got up at 4:30 a.m. and came to work in the morning. [Doc. No. 81, Lavassani Dep. pp. 27–29]. Jones then reiterated his immediate need for the videotape and threatened to "shut down the store" until he got the videotape. Further, Jones accused Lavassani of being guilty of obstruction and demanded that Lavassani provide his name and number so that Jones could send someone to Lavassani's home to pick him up. Finally, Jones reiterated that Lavassani was "obstructing a police investigation" and that Jones had a right to the videotape. Jones then ended the conversation by hanging up the phone.

Immediately after hanging up the phone, Jones demanded that Woldeyohanes show him where the videotape was located. While Woldeyohanes was showing Jones the location of the videotape, Jones communicated on his radio that he was "trying to pull the damn the tape" but the store owner would not turn it over so Jones told the owner that he "was going to shut the god damn store down" and planned to "lock somebody's ass up for obstruction." Upon confirming that he would not be able to access the videotape, Jones directed Woldeyohanes to "write down his boss's name" because Jones was "going to lock his ass up." Additionally, Jones stated that Lavassani needed to "get his ass up here and give [Jones] the tape" and that Jones would have Woldeyohanes's "ass locked up for obstruction" if he did not provide Jones with Lavassani's full name and phone number. Woldeyohanes complied with Jones's demand.

Between 11:42 p.m. and midnight, Jones remained in the vicinity of the store and warned Woldeyohanes that Jones "ain't helping [Lavassani] out" in the future because Lavassani would not turn over the videotape. Additionally, Jones questioned whether Lavassani cared about the store

clerk or the fact that the perpetrators had been in the store while armed. Jones even declared that he "would quit in a heartbeat" if he had to work for Lavassani. Jones then went outside the store while Woldeyohanes started counting money, mopping the floor, turning out lights, locking the front door, and performing other tasks in preparation of closing the store.

## 2. Second Attempt to Obtain the Videotape

On May 2, 2008, at approximately 12:10 a.m., CPD officers returned to the front entrance door of the Shell station, which was closed. Woldeyohanes met the officers at the entrance and informed them that he still did not have access to the videotape. In response, an unidentified officer informed Woldeyohanes that the store clerk would need to stay here until "C.I.D arrived." [7] Moreover, the unidentified officer explained that if Woldeyohanes could not turn the videotape over, then the police would have to get a search warrant. The unidentified officer continued the conversation by asking Woldeyohanes questions regarding the three perpetrators.

After Woldeyohanes had answered the officer's questions, Jones inquired again as to the location of the owner and directed Woldeyohanes to call Lavassani so that he could come and give the police the videotape. In giving the directive to Woldeyohanes, Jones explained, "Here is the thing ... he can either come give us the tapes or I'm shutting the store down and I'm gonna rip the sons of bitches out of the wall." Jones then declared, "[Lavassani] could get it back next year" and "with a search warrant, and I'm gonna take them."

At approximately 12:15 a.m., Detective Rodney Campbell of the CPD CID arrived

7. C.I.D. stands for Criminal Investigation De- partment.

and went inside the Shell station.[8] He immediately started discussing the situation with multiple officers, including Jones, inside the store.[9] A few minutes later, Lavassani called the store again and spoke with Campbell. Campbell stated, "This is Detective Campbell. I need the video. [Inaudible response from Lavassani]. OK, I'm shutting your store down. I'm leaving an officer here. No one can re-enter the store. OK, I'm taking [Woldeyohanes] out. I'm getting a search warrant, and I'm taking everything in it out. Thank you." Campbell hung up the phone and then instructed Woldeyohanes, "Get out!"

Lavassani then called the store again and spoke with Jones. Lavassani's statements cannot be heard, but Jones exclaimed, "Cause it is in my custody right now because we're waiting on a search warrant! [pause and inaudible response from Lavassani] Well why don't you march your ass up here, and I'll show you what I'll do when you get up here! You come on up here!" Jones then hangs up and warns the other officers, "If he tries to get in here, you snatch [him]! God damn I'm mad! He told me to 'get the hell out of his store.' Well, I'm fixin' to get out of his store. It is our store right now. Fuck that son of a bitch! Fuck him!"[10] Then, upon another officer's inquiry as to the store owner's name, Jones declared his

name was "Long dong dumbass, I think" and then revisits his phone conversation with Lavassani.[11] Specifically, Jones said, "[Lavassani] told me to get the hell out of his store and let his employee close the store or [Lavassani] would come up there. I told him this ain't your god damn store anymore mother fucker!" Finally, Jones exclaimed, "He's pissed me off! I hope that mother fucker comes up here! I'm gonna spray his ass!"

### 3. After the Conversation with Lavassani

Shortly after Jones concluded his phone conversation with Lavassani, Campbell began questioning the other officers and taking notes as to the CPD's specific need for the videotape.[12] As Campbell took notes, Woldeyohanes informed the officers that Lavassani was on his way to the store.[13] Woldeyohanes' information prompted another unidentified officer to declare, "I never liked the guy who owned this place. One time he told me to get off of his property." Jones responded, "I don't like him. Tell him to fuck off!" Then, after Campbell asked Woldeyohanes to write down the store owner's name, the officers offered more derogatory remarks regarding Lavassani's name and nationality. Finally, when the officers learned from Woldeyohanes that Lavassani was coming

---

8. Jones had contacted Campbell earlier in an effort to get his assistance in the investigation of armed robbery. [Doc. No. 90, Rivas Dep. pp. 44–46]. Campbell was summoned despite the fact that Detective German Allen Rivas was actually the CPD C.I.D. Detective on call for the night of May 1–2, 2008. *Id.*

9. At one point, there were at least 6 CPD officers inside of the store.

10. Meanwhile, another officer stated, "I'ma [sic] start cooking up some hotdogs. Theyll be ready by the time he gets up here."

11. While Jones refers to Lavassani as "Long dong dumbass," other unidentified officers claimed that his name was "Patel" and made other derogatory remarks.

12. Various officers responded to Campbell's inquiry, but the consensus was that the three perpetrators had been inside the store and could potentially be identified on the videotape.

13. Lavassani went to the Shell station to turn over the videotape because of the CPD officers' threats. [Doc. No. 81, Lavassani Dep. p. 32].

from Marietta, an unidentified officer declared, "I'm gonna lock him up."

At approximately 12:25 a.m., Campbell asked Woldeyohanes, "Can I have a fountain drink?" Woldeyohanes consented, and then Campbell fixed himself a fountain drink. At the same time, the other officers in the store started formulating a plan for when Lavassani arrived. Specifically, Jones stated, "if [Lavassani] starts showing his ass, then you let me talk to him. He already told me to get out of his store." Further, Jones declared, "I'm gonna get a good lick in on him. I wish I had that damn taser! That mother fucker, he'd habib his ass back to god damn India!" An unidentified officer then stated, "He'll be mouthy as hell when he tries to come in here." Two other unidentified officers then responded, with one stating, "He's not coming in here. He thinks he is going to [come in here]. It's going to be bad." The other officer discussed a scenario for taking Lavassani to jail.

At 12:28 a.m., Campbell began telling the officers a story about pulling over a female driver in the past.[14] Then at 12:32 p.m., the victim of the armed robbery entered the store to speak with the officers of the CPD. Over the next ten minutes, the victim offered his account of what had happened early that evening.[15] Ultimately, one of the CPD officers directed the victim to return to his truck.

### C. Lavassani's Arrival and Arrest [16]

Lavassani arrived at the Shell station at approximately 12:42 a.m. on May 2, 2008. At the time of his arrival, Woldeyohanes, Detective German Allen Rivas,[17] Campbell, Jones,[18] and CPD Sergeant Johnson were standing around one of the CPD police cars outside the entrance to the store.[19] Woldeyohanes immediately greeted Lavassani and warned "stay calm because [the officers] have plans for [Lavassani]." [Doc. No. 81, Lavassani Dep. p. 39]. When Lavassani approached the group, he shook hands with Campbell and began talking. Lavassani appeared upset as he waived his arms and pointed his finger. He expressed his frustration with the CPD officers' occupation of his property and the

14. At least five officers occupied the store while Campbell told a story about pulling a female driver over who had a Florida driver's license, an Alabama vehicle tag, lived in Jacksonville, Florida, and claimed to be married to a dentist from Ellijay, Georgia.

15. In sum, the victim claimed his "old lady" got home at about "12 or 15 after 11:00 p.m." At that time, the victim departed the Alexander Ridge Apartments and was near some steps when the three perpetrators came up to him. According to the victim, "the second one" got close and pulled out a pistol with his left hand. The victim then declared that he didn't have anything and pulled out his billfold. One of the perpetrators snatched the victim's billfold, but the victim snatched it back. Ultimately, the perpetrators took two dollars, cigarettes, and a cellphone from the victim. According to the victim, the perpetrators "weren't nothing but little children— [around the age of] 15, 16, 17." Finally, the

victim claimed that the perpetrators walked off, and he went to apartment and called 911.

16. All of the facts and times regarding the events occurring outside the Shell station during the early morning hours of May 2, 2008, are based primarily upon the videotape from Camera 8, which did not have audio, located outside the store [Doc. No. 84, Pls.' Ex. 5].

17. As noted in footnote 8, Rivas was the on call C.I.D. Detective for the CPD on the night of May 1–2, 2008, but was not initially contacted by Jones. Rivas arrived at the Shell station at approximately 12:34 a.m. and remained outside while talking with Woldeyohanes, Johnson, Campbell, and on his own cell phone at various time.

18. Jones came outside at 12:41 a.m.

19. At the time of Lavassani's arrival, there were a minimum of 5 CPD police vehicles in the Shell station parking lot.

manner in which he had been spoken to by one of those officers on the telephone.[20] [Doc. No. 81, Lavassani Dep. p. 40]. Moreover, he explained that he had always been cooperative with the CPD and had provided Rivas access to his store's surveillance videos on multiple occasions in the past.[21] [Doc. No. 81, Lavassani Dep. p. 44]. As the group watched Lavassani and Campbell talk, Jones re-positioned himself between Lavassani and the store's entrance. Attempting to defuse the conversation between Campbell and Lavassani, Rivas directed, "Come on sir, let's just go inside and get the video." [22] [Doc. No. 90, Rivas Dep. p. 78]. Rivas then began escorting Lavassani towards the store's entrance under the believe that Rivas would obtain the videotape from Lavassani. [Doc. No. 90, Rivas Dep. p. 79].

As Rivas and Lavassani walked towards the entrance and away from Campbell, Campbell pursued Lavassani from behind and then got nose to nose with Lavassani's face in a confrontational manner.[23] [Doc. No. 81, Lavassani Dep. p. 44]. While in close proximity, Campbell exclaimed, "If I called you an asshole, I would have said it to your god damn face. I'll call it to your god damn face, son of a bitch." [Doc. No. 81, Lavassani Dep. p. 45]. Lavassani responded by requesting that Campbell back off. *Id.* Meanwhile, Jones re-positioned

himself again between Lavassani and the entrance to the store.

Ultimately, Campbell walked away from Lavassani. Then, upon making eye contact with and seeing a head motion made by Rivas,[24] Lavassani again advanced towards the entrance in order to go inside and turn over the videotape [Doc. No. 81, Lavassani Dep. p. 47–48]. Meanwhile, Jones got in front of Lavassani and declared, "God damn you, mother fucker, I'm going to take over this god damn mother fucking thing. If you take one more god damn step, then I will lock your fucking ass up. Your ass is going to jail." [25] [Doc. No. 81, Lavassani Dep. p. 51]. At this point, Lavassani was confused because he thought he was supposed to go inside of the store with Rivas. [Doc. No. 81, Lavassani Dep. p. 46]. Then, after shouting at the store owner to get back and threatening to arrest him, Jones grabbed Lavassani's right arm while three other officers (Campbell, Combs and Yarbrough) abruptly piled on top of Lavassani and wrestled him to the ground to place him in handcuffs. During the physical confrontation, the CPD officers punched and elbowed Lavassani in the face a few times, injured his arm and back, and rubbed his face on the concrete. [Doc. No. 81, Lavassani Dep. p. 60–61]. At 12:45 a.m., the officers finally placed Lavassani into Johnson's po-

---

**20.** Specifically, Lavassani accused Campbell of calling him an "asshole" during the telephone conversation. [Doc. No. 81, Lavassani Dep. p. 41].

**21.** Rivas confirmed that Lavassani had assisted him on multiple occasions regarding access to the Shell station's videotape. [Doc. No. 90, Rivas Dep. pp. 74–75].

**22.** Rivas's directive was made in a tone and manner that the individual defendants and everyone else outside of the Shell station could hear. [Doc. No. 90, Rivas Dep. p. 88].

**23.** According to Lavassani, Campbell tried to bump Lavassani with Campbell's big stomach. [Doc. No. 81, Lavassani Dep. p. 44–45]. In response, Lavassani requested that Campbell get out of his face. *Id.*

**24.** Lavassani believed Rivas's head motion indicated that the detective wanted Lavassani to enter the store with him [Doc. No. 81, Lavassani Dep. p. 48–49].

**25.** At the same time, Johnson opened the backdoor to one of the police cars.

lice car and within two minutes the car pulled away.

### D. After Lavassani's Arrest

Once Lavassani was in custody, Campbell and Rivas went to obtain a search warrant for the videotape inside the Shell station. Meanwhile, prior to their return with the warrant, the three perpetrators involved in the armed robbery had been apprehended around 3:00 a.m. by the CPD near a Kroger grocery store with the stolen property in hand and unarmed.[26] Despite the arrest, the warrant was executed in the early morning hours by Rivas, Campbell, and Jones. However, the CPD officers still could not access the videotape recordings because the recordings were password protected. Thus, the officers relied on Lavassani's wife to retrieve the password from her husband while he was still held in the Cherokee County Adult Detention Center.

At some point after Lavassani's arrest, Jones ordered Yarbrough to charge Lavassani with four counts of felony obstruction. Yarbrough then produced a sworn statement that Lavassani had been fighting with the officers during the arrest even though, according to Lavassani, Yarbrough knew the store owner did not fight. Ultimately, the Cherokee County District Attorney dropped the obstruction charges against Lavassani because there was no evidence of obstruction.

### II. Plaintiffs' Complaint [Doc. No. 1]

As an initial matter, the court concludes that the plaintiffs' complaint [Doc. No. 1] is a quintessential shotgun pleading. *See, e.g., Morro v. City of Birmingham,* 117

F.3d 508, 515 (11th Cir.1997); *Ebrahimi v. City of Huntsville Board of Education,* 114 F.3d 162, 164 (11th Cir.1997). The complaint is framed in 12 counts, but Counts XI and XII, which are presented as claims, are not substantive.[27] In fact, the relief sought in Counts XI and XII are wholly dependent upon the other substantive claims in the complaint.

The plaintiffs' only federal law claim is contained in Count I, Liability for Violations of 42 U.S.C. § 1983 ("Section 1983"). Count I is broken down into 4 parts and 29 paragraphs [Doc. No. 1, ¶¶ 46–74], and consists of numerous claims for violations of various constitutional rights. More specifically, in Part A [Doc. No. 1, ¶¶ 49–55], the plaintiffs allege that their Fourth Amendment Rights against unreasonable search and seizure and malicious prosecution were violated by Defendants Jones, Campbell, Combs, and Yarbrough (collectively "individual defendants"). Next, in Part B [Doc. No. 1, ¶¶ 56–59], Blue Sea claims that its Fifth Amendment Rights to be free from taking without just compensation were violated by the individual defendants. Then, in Part C [Doc. No. 1, ¶¶ 60–69], the plaintiffs assert that their Fourteenth Amendment Substantive and Procedural Due Process Rights were violated by the City Defendants as a result of the City's policy or custom of not properly training the CPD officers and deliberate indifference as to the rights of the citizens of Canton. Additionally, Lavassani claims the individual defendants maliciously prosecuted him in violation of his Fourteenth Amendment rights. Finally, in Part D [Doc. No. 1, ¶¶ 70–74], Lavassani claims that his Fourteenth Amendment Right to

---

26. In fact, the victim of the armed robbery was inside the Kroger, saw the three perpetrators, and immediately alerted the authorities by calling 911.

27. In Count XI, the plaintiffs seek "Liability for Punitive Damages." In Count XII, the plaintiffs seek "Liability for Attorney's Fees Under 42 U.S.C. §§ 1983 and 1988 and Georgia's Statutory and Common Law."

Equal Protection Under the Law was violated by the individual defendants because they were motivated and driven by animus and intent to discriminate toward Lavassani because of Lavassani's national origin and race.

In Counts II through X, the plaintiffs assert nine different Georgia state law claims. Counts II through VII are asserted against the individual defendants, and Counts VIII and XI are asserted against the City Defendants. Meanwhile, the plaintiffs assert Count X (Violation of the Georgia Open Records Act, O.C.G.A. § 50–18–70) against all of the defendants and seek an order from the court requiring the defendants to make the requested records immediately available.

## III. Official vs. Individual Capacity

In the complaint, the plaintiffs sue the City of Canton plus all of the individually named police officers in both their individual and official capacities. Individual-capacity suits seek to impose personal liability upon a government official for action taken under color of state law. *See Scheuer v. Rhodes*, 416 U.S. 232, 237–38, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). In contrast, official-capacity suits "generally represent another way of pleading an action against an entity of which an officer is an agent." *Monell v. New York City Department of Social Services*, 436 U.S. 658, 699 n. 55, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity. *Brandon v. Holt*, 469 U.S. 464, 471–72, 105 S.Ct. 873, 83 L.Ed.2d 878 (1985). A lawsuit against an individual in his or her official capacity is not a suit against the official personally, for the real party in interest is the entity—in this case, the City of Canton. There-fore, because the City of Canton is a named defendant in the lawsuit, it is not necessary to sue the individual defendants in their official capacity.

## IV. Summary Judgment Legal Standard

Rule 56(c) of the Federal Rules of Civil Procedure authorizes a court to enter summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." The party seeking summary judgment bears the burden of demonstrating that no dispute exists as to any material fact. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). This burden is discharged by " 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support [an essential element of] the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In determining whether the moving party has met its burden, a district court must view the evidence and all factual inferences in the light most favorable to the party opposing the motion. *Johnson v. Clifton*, 74 F.3d 1087, 1090 (11th Cir. 1996).

Once the moving party has adequately supported its motion, the nonmovant has the burden of showing that summary judgment is improper by coming forward with specific facts showing a genuine dispute. *Matsushita Elec. Indust. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Ultimately, the court's function is not to resolve issues of material fact, but rather to determine whether there are any such issues to be tried. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251, 106 S.Ct. 2505, 91

L.Ed.2d 202 (1986). Facts that are disputed, but which do not affect the outcome of the case, are not material and thus will not preclude the entry of summary judgment. *Id.* at 248, 106 S.Ct. 2505. Genuine disputes are those in which "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

## V. Analysis and Application of Law

Section 1983 creates no substantive rights. *See Baker v. McCollan,* 443 U.S. 137, 140, 144 n. 3, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979). Rather, Section 1983 provides a vehicle through which an individual may seek redress when his or her federally protected rights have been violated by an individual acting under color of state law. *See Livadas v. Bradshaw,* 512 U.S. 107, 132, 114 S.Ct. 2068, 129 L.Ed.2d 93 (1994) (citations omitted). Thus, for every Section 1983 claim, a plaintiff must identify a specific federal right and demonstrate that the standard of care provided for by that right has been violated by a state actor. *See Graham v. Connor,* 490 U.S. 386, 394, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). In this case, the plaintiffs claim that the defendants violated their Fourth Amendment, Fifth Amendment, and Fourteenth Amendment rights.

### A. Fifth Amendment Claim

■ In Count I, Part B [Doc. No. 1, ¶¶ 56–59] of the complaint, Blue Sea claims that its Fifth Amendment Right to be free from taking without just compensation were violated by the defendants. However, in *Williamson County Regional Planning Commission v. Hamilton Bank of Johnson City,* 473 U.S. 172, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985), the United States Supreme Court explained:

The Fifth Amendment does not proscribe the taking of property; it proscribes taking without just compensation. Nor does the Fifth Amendment require that just compensation be paid in advance of, or contemporaneously with, the taking; all that is required is that a reasonable, certain and adequate provision for obtaining compensation exist at the time of the taking. If the government has provided an adequate process for obtaining compensation, and if resort to that process yields just compensation, then the property owner has no claim against the Government for a taking. Thus, we have held that taking claims against the Federal Government are premature until the property owner has availed itself of the process provided by the Tucker Act, 28 U.S.C. § 1491. Similarly, if a State provides an adequate procedure for seeking just compensation, the property owner cannot claim a violation of the Just Compensation Clause until it has used the procedure and been denied just compensation.

*Id.* at 194–95, 105 S.Ct. 3108 (citations and quotations omitted). Therefore, a takings clause claim under the Fifth Amendment does not arise unless the state provides no remedy to compensate the landowner for the alleged taking. *Bickerstaff Clay Products Co., Inc. v. Harris County, Georgia,* 89 F.3d 1481, 1491 (11th Cir.1996).

Under Georgia law, a landowner may bring suit under the due process provisions of the Georgia Constitution, Ga. Const. art. I, § I, par. I and § III, par. I, to seek redress for the "taking" of his property. *See, e.g., Gradous v. Board of Commissioners,* 256 Ga. 469, 349 S.E.2d 707 (1986). In this case, the undisputed facts show that Blue Sea has not pursued available and adequate remedies under Georgia state law for its taking clause claim. Therefore, the claim is not ripe for consideration in federal court, and the court dismisses, without prejudice, Blue Sea's Fifth Amendment claim.

## B. Fourteenth Amendment Claims against City Defendants

In Part C of Count I of the complaint, the plaintiffs allege that the City Defendants are liable under 42 U.S.C. § 1983 because of the CPD's custom or policy of failing to adequately train CPD officers and were deliberately indifferent to the plaintiffs' constitutional rights. Moreover, the plaintiffs allege that Vande Zande directly participated in the events leading up to the alleged violation of Lavassani's constitutional rights.

In addressing the plaintiffs' claims in their motion for summary judgment [Doc. No. 74], the City Defendants contend that they are entitled to judgment as a matter of law because no evidence exists in the record to create a jury question on whether:

(a) the CPD had a custom or policy that was the "moving force" of any purported violation of any of the plaintiffs' constitutional rights, *See Monell,* 436 U.S. at 691, 98 S.Ct. 2018;

(b) there was an identified deficiency in the CPD's training program, closely related to the plaintiffs' injury for which recovery is sought in this case, to which the CPD was deliberately indifferent and which caused the deprivation for which recovery is sought, *City of Canton, Ohio v. Harris,* 489 U.S. 378, 388, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989); and,

(c) Lance and/or Vande, neither of whom was present at the scene of the incident, can be held liable under a theory of *respondeat superior* or vicarious liability for the alleged unconstitutional acts of their subordinates, *Fundiller v. City of Cooper City,* 777 F.2d 1436 (11th Cir.1985).

■ In response, the plaintiffs argue that the court should deny the city defendants' motion for summary judgment because: (1) the evidence shows that Vande Zande directly participated in the events,[28] and (2) because there is a "pattern of inaction and disinterest" demonstrated on the part of Lance and Vande Zande regarding supervision and training CPD officers. With regard to the municipality, the plaintiffs assert that the City of Canton is liable for the violation of their constitutional rights. Moreover, the plaintiffs argue that the actions of Lance and others in the CPD established a policy or custom of the city that caused the plaintiffs' injuries and the actions of the CPD on May 1–2, 2008, demonstrated the City of Canton's "pattern of deliberate indifference" with respect to obvious lack of training of its police officers.

### 1. City of Canton

#### a. Liability under Section 1983

A local government may not be sued under Section 1983 simply because an injury is inflicted by its employees or agents. Instead, it is only when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government is responsible under Section 1983. *Monell,* 436 U.S. at 658, 98 S.Ct. 2018. The Eleventh Circuit has determined that in order "to impose § 1983 liability on a municipality, a plaintiff must show: (1) that his constitutional rights were violated; (2) that the municipality had a custom or policy that constituted a deliberate indifference to that constitution-

---

**28.** "Supervisory liability occurs either when the supervisor personally participates ... or when there is a causal connection between the actions of the supervising official and the alleged constitutional deprivation...." *Danley v. Allen,* 540 F.3d 1298, 1314 (11th Cir. 2008).

al right; and (3) that the policy or custom caused the violation." *McDowell v. Brown*, 392 F.3d 1283, 1289 (11th Cir. 2004).

### b. Policy or Custom Element

Regarding the Eleventh Circuit's second element of Section 1983 liability, the plaintiff must "identify a municipal 'policy' or 'custom' that caused the plaintiff's injury." *Board of Commissioners of Bryan County, Oklahoma v. Brown*, 520 U.S. 397, 403, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997). A policy or custom is "a practice that is so settled and permanent that it takes on the force of the law." *Monell*, 436 U.S. at 690–91, 98 S.Ct. 2018. This threshold identification of a policy or custom "ensures that a municipality is held liable only for those deprivations resulting from the decisions of its duly constituted legislative body or of those officials whose acts may fairly be said to be those of the municipality." *Brown*, 520 U.S. at 403–04, 117 S.Ct. 1382. Furthermore, "this prevents the imposition of liability based upon an isolated incident." *McDowell*, 392 F.3d at 1290.

 For a plaintiff to demonstrate a policy or custom, it is generally necessary to show a persistent and wide-spread practice. *Church v. City of Huntsville*, 30 F.3d 1332, 1345 (11th Cir.1994); *see also Depew v. City of St. Marys*, 787 F.2d 1496, 1499 (11th Cir.1986). "A municipality's failure to correct the constitutionally offensive actions of its police department may rise to the level of a custom or policy if the municipality tacitly authorizes these actions or displays deliberate indifference towards the police misconduct," but there must at least "be evidence that city officials were aware of past police misconduct" in order

to find liability. *Brooks v. Scheib*, 813 F.2d 1191, 1193 (11th Cir.1987) (citations omitted).

### c. Canton's Policy or Custom

 In this case, the plaintiffs argue that the "the course of action and conduct adopted by Chief Lance and his subordinates before and after the incident from which this action arises sets the City of Canton's policies with respect to law enforcement in the jurisdiction." Moreover, according to the plaintiffs, those events and policies demonstrate the City of Canton's "deliberate indifference" to the alleged lack of training of CPD officers and to the constitutional rights of the citizens of Canton. In sum, the plaintiffs attempt to impose liability on the City of Canton based on the events of May 1–2, 2008.[29] However, finding the City of Canton liable based upon the plaintiffs' arguments and evidence in support is exactly what Section 1983 is designed to prevent. *McDowell*, 392 F.3d at 1290; *see also Brooks*, 813 F.2d at 1193.

The plaintiffs' arguments are an effort to create liability by extracting key phrases and terms from applicable case law and then misapplying those phrases and terms to the events surrounding May 1–2, 2008. Essentially, the plaintiffs rely solely on the events surrounding May 1–2, 2008, as evidence sufficient to support its claim of a policy or custom. Further, the plaintiffs failed to identify any evidence, outside of the events surrounding May 1–2, 2008, to support a finding of "a persistent and widespread practice" and awareness by city officials. Thus, the plaintiffs failed to present evidence to support their claim of

---

**29.** The plaintiffs failed to produce any evidence outside of the events relating to May 1–2, 2008, in support of their claims. Instead, the plaintiffs' opposition brief [Doc. No. 92] focuses only on the events surrounding May 1–2, 2008, coupled with assertions that the City of Canton and the supervisors of the CPD failed to adequately train and were deliberately indifferent.

a custom or policy by the City of Canton. Accordingly, there is no genuine issue of material fact exists as to the liability of the City of Canton under Section 1983, and the court will grant the City of Canton's motion for summary judgment as to the plaintiffs' claims under Section 1983.

### 2. Lance and Vande Zande

The plaintiffs claim that Lance and Vande Zande, as the supervisors of the CPD, are liable under Section 1983 for having a policy of not training CPD officers and a policy of failing to investigate officer misconduct. Further, the plaintiffs allege that Lance and Vande Zande were indifferent to the harm and damages caused by these policies. Finally, the plaintiffs allege that Vande Zande directly participated in the alleged constitutional violations and is thus individually liable.

In their motion for summary judgment, Lance and Vande Zande argue that there is no evidence in the record to create a jury question whether they are liable to the plaintiff under applicable legal standard for supervisory liability under Section 1983.

### a. Supervisor Liability under Section 1983

■ It is well established that supervisory officials are not liable under § 1983 for the unconstitutional acts of their subordinates on the basis of *respondeat superior* or vicarious liability. *Hartley v. Parnell,* 193 F.3d 1263, 1269 (11th Cir.1999). In fact, "the standard by which a supervisor is held liable in [his or] her individual capacity for the actions of a subordinate is extremely rigorous." *Braddy v. Florida Department of Labor & Employment Sec.,* 133 F.3d 797, 802 (11th Cir.1998). Supervisory liability under Section 1983 occurs either when the supervisor personally participates in the alleged unconstitutional conduct or when there is a causal connection between the actions of a supervising

official and the alleged constitutional deprivation. *Brown v. Crawford,* 906 F.2d 667, 671 (11th Cir.1990). Moreover, to establish the necessary causal connection, a plaintiff must show "a history of widespread abuse [that] puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so." *Braddy,* 133 F.3d at 802. Alternatively, the causal connection may be established when a supervisor's "custom or policy ... result[s] in deliberate indifference to constitutional rights" or when facts support "an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so." *Rivas v. Freeman,* 940 F.2d 1491, 1495 (11th Cir.1991); *see also Hartley,* 193 F.3d at 1263.

### b. Lance

■ Here, the plaintiffs do not contend that Lance personally participated in, directed, or "knew that the subordinates would act unlawfully and failed to stop" the alleged constitutional violations. Further, the plaintiffs do not claim that a "history of widespread abuse" put Lance on notice. Instead, the plaintiffs assert only that Lance had a policy or custom of not training CPD officers and failing to investigate officer misconduct that resulted in deliberate indifference to constitutional rights. More specifically, the plaintiffs claim that Lance's policy or custom of not training or properly investigating is evidenced by the events surrounding the May 1–2, 2008, arrest of Lavassani and the investigations conducted thereafter. In other words, the plaintiffs premise the liability of Lance on a policy or custom that is supported only by evidence of the events surrounding the May 1–2, 2008.

The United States Supreme Court has held that a single violation of constitutional

rights does not amount to an official policy or custom resulting in the deprivation of an individual's constitutional rights. *City of Oklahoma v. Tuttle,* 471 U.S. 808, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985). In this case, the plaintiffs have failed to produce any evidence outside of the CPD officers' actions surrounding May 1–2, 2008, to support their claim that Lance had a policy or custom of failing to train CPD officers or adequately investigate misconduct. In fact, the evidence produced by the defendants on these issues shows that all of the CPD officers were Peace Officer Standard and Training ("POST") certified as required under Georgia law, and all of them have received mandated annual training in order to maintain their certifications. Furthermore, the defendants' evidence also shows that an investigation into the incident involving Lavassani's arrest took place and remedial measures were taken by the supervisors.[30] Thus, there is an absence of evidence in this case to support a claim that Lance had a policy or custom of not training CPD officers and failing to investigate officer misconduct. Accordingly, there is no genuine issue of material fact exists as to the liability of Lance under Section 1983, and the court will grant Lance's motion for summary judgment as to the plaintiffs' claims against him under Section 1983.

### c. Vande Zande

The plaintiffs claim that Vande Zande is liable under Section 1983 for the same reasons as Lance.[31] Additionally, the plaintiffs allege that Vande Zande is individually liable because his actions on May 1–2, 2008, constituted "direct participation" and caused the violation of the plaintiffs' constitutional rights. As an initial matter and for the reasons set forth above in Part V, Paragraph (B.)(2.)(b.), the court concludes that no genuine issue of material fact exists to the liability of Vande Zande under Section 1983 for having a policy or custom that resulted in deliberate indifference to constitutional rights.

■ Regarding the plaintiffs' contention that Vande Zande directly participated in the violation of their constitutional rights, the court concludes that evidence that Vande Zande received two phone calls from Jones during May 1–2, 2008, does not equate to "personal participation in the acts that comprise the constitutional violation." *Lewis v. Smith,* 855 F.2d 736, 738 (11th Cir.1988). The undisputed facts show that Jones's first phone call to Vande Zande was to alert the deputy chief of the armed robbery and the CPD's efforts to obtain the videotape from the Shell station. In response to the first call, Vande Zande specifically directed Jones to obtain a search warrant if necessary. Jones's second call to Vande Zande, made several hours after Lavassani's arrest, was to inform the deputy chief that the three armed robbery perpetrators had been apprehended. Based upon these facts, the court concludes that no reasonable jury could return a verdict for the plaintiffs on the issue of whether Vande Zande directly participated in the alleged constitutional violations.

---

**30.** The plaintiffs' evidence to support its claim that Lance had a policy of not adequately investigating misconduct was the fact that supervisors had not read some of the CPD officers' sworn statements and the fact that "Jones was aghast at having received a written notification that he was being investigated as a result of Lavassani's complaint."

**31.** The plaintiffs allege that Vande Zande, as Deputy Chief and supervisor, had a policy or custom of not training CPD officers and failing to investigate officer misconduct that resulted in deliberate indifference to constitutional rights.

Finally, the plaintiffs allege that Vande Zande's actions caused the alleged violations because of his "failure to provide adequate instructions about obtaining a search warrant arguably directly resulted in the confrontation initiated by Campbell and Jones because at the time Jones contacted Vande Zande the officers were already overtly frustrated and angry with Lavassani." In other words, the plaintiffs contend that there was a "causal connection" between Vande Zande's actions and the alleged constitutional deprivation. For purpose of Section 1983 supervisor liability, in order to establish a "casual connection," the plaintiffs must establish:

> A history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so. The deprivations that constitute widespread abuse sufficient to notify the supervising official must be obvious, flagrant, rampant, and of continued duration, rather than isolated occurrences.

*Id.*; *see also Brown v. Crawford*, 906 F.2d 667, 671 (11th Cir.1990). In this case, the plaintiffs did not present any evidence to support "a history of widespread abuse" that would have put Vande Zande on notice. Accordingly, the plaintiffs' claim that Vande Zande is liable as a supervisor fails as a matter of law, and the court grants Vande Zande's motion for summary judgment as to the plaintiffs' claims against him under Section 1983.

### C. Fourteenth Amendment Claims against Individual Defendants

#### 1. Malicious Prosecution Claim

██ In addition to the claims against the City Defendants, Lavassani claims the individual defendants maliciously prosecuted him in violation of his Fourteenth Amendment rights. However, "a malicious prosecution claim arises under the Fourth Amendment, not Fourteenth

Amendment substantive due process." *Rehberg v. Paulk*, 598 F.3d 1268, 1287 (11th Cir.2010). Moreover, the complaint does not allege a procedural due process claim under the Fourteenth Amendment because it does not claim that Lavassani was denied the constitutionally required procedures necessary to challenge his indictments and arrest. *See Albright v. Oliver*, 510 U.S. 266, 272, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994). Accordingly, the individual defendants are entitled to summary judgment on Lavassani's Section 1983 claim for malicious prosecution in violation of the Fourteenth Amendment.

#### 2. Equal Protection Claim

In Count I, Part D of the complaint [Doc. No. 1, ¶¶ 70–74], Lavassani claims that his Fourteenth Amendment Rights to Equal Protection under the law were violated. More specifically, Lavassani alleges that the individual defendants are liable because they were motivated and driven by animus and intent to discriminate toward his because of his national origin and race.

██ "The purpose of the Equal Protection Clause of the Fourteenth Amendment is to secure every person within the State's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents." *Village of Willowbrook v. Olech*, 528 U.S. 562, 564, 120 S.Ct. 1073, 145 L.Ed.2d 1060 (2000) (citations omitted). Thus, "the Equal Protection Clause requires government entities to treat similarly situated people alike." *Campbell v. Rainbow City, Alabama*, 434 F.3d 1306, 1313 (11th Cir.2006). To show a violation of the Equal Protection Clause of the Fourteenth Amendment, a plaintiff must prove by a preponderance

of the evidence in the case that the defendants' actions had a discriminatory effect and were motivated by a discriminatory purpose. *Washington v. Davis*, 426 U.S. 229, 239–42, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976). More specifically, "the plaintiff must prove that he was discriminated against by establishing that other similarly-situated individuals outside of his protected class were treated more favorably." *Amnesty International, USA v. Battle*, 559 F.3d 1170, 1180 (11th Cir.2009).

In this case, Lavassani claims that the individual defendants treated him differently because of his national origin and race. However, Lavassani did not produce any evidence to support his claim that "other similarly-situated individuals outside of his protected class were treated more favorably." *Id.* Instead, Lavassani asserts that the CPD was "maligned with 'bad apples and cowboys' " and maintained a climate "where officers were permitted to threaten and escalate a police-citizen confrontation without fear of repercussion or punishment by supervisors for breaching their duty to maintain the public order and peace." [Doc. No. 92, p. 16]. Further, Lavassani contends that the CPD had "a department-wide indifference to constitutional rights and concerns as a general rule." [*Id.*]. In other words, Lavassani claims that CPD officers treated all of the citizens that the officers encountered the same by being indifferent to the citizens' constitutional rights. Therefore, the court concludes that the individual defendants are entitled to summary judgment on Lavassani's Section 1983 claim for violation of the Equal Protection Clause of the Fourteenth Amendment.

**32.** The court notes that the plaintiffs allege that the individual defendants took a fountain drink and money. However, regarding the fountain drink, Woldeyohanes permitted Campbell to have a drink. And, as to the alleged missing money, the plaintiffs never identified a specific amount or produced any evidence (i.e., financial receipts or records) to support their claim that money was missing.

## D. Fourth Amendment Claims

### 1. Blue Sea and Lavassani Properties LLC

Plaintiffs Blue Sea and LP are corporate entities that claim the individual defendants violated their rights under the Fourth Amendment. More specifically, Blue Sea claims the individual defendants unreasonably seized the Shell station and seized certain personalty and inventory from the premises. LP alleges that the individual defendants trespassed upon and unreasonably seized exclusive control over the real property upon which the Shell station was located.

While the Fourth Amendment is applicable to corporations, *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 98 S.Ct. 1816, 56 L.Ed.2d 305 (1978), the loss, theft or destruction of property does not implicate the Fourth Amendment. *See generally Hudson v. Palmer*, 468 U.S. 517, 540, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984) (consenting opinion). Rather, such claims have long been redressable in tort by actions for detinue, trespass to chattel, and conversion.[32] *Id.* Furthermore, regarding the claim that the individual officers seized the property in violation of two corporate entities' Fourth Amendment rights, the United States Supreme Court, has held that "a seizure affects only the person's possessory interests; a search affects a person's privacy interests." *Segura v. United States*, 468 U.S. 796, 806, 104 S.Ct. 3380, 82 L.Ed.2d 599 (1984). Recognizing the generally less intrusive nature of a seizure, the United States Supreme Court "has frequently approved warrantless seizures of property, on the basis of probable cause,

for the time necessary to secure a warrant, where a warrantless search was either held to be or likely would have been held impermissible." *Id.* The standard for probable cause regarding warrantless seizures while awaiting a search warrant is a "practical, nontechnical conception that deals with the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Maryland v. Pringle,* 540 U.S. 366, 370, 124 S.Ct. 795, 157 L.Ed.2d 769 (2003) (quotations omitted). It "is a fluid concept-turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Id.* at 370–71, 124 S.Ct. 795.

▮ In determining whether probable cause to seize the Shell station while awaiting the search warrant existed in this case, the court concludes that probable cause existed. The undisputed facts show that the individual defendants initially searched the Shell station with the consent of Woldeyohanes, who led them to the store's office and remained present for a majority of the time in which the officers were inside of the store without a search warrant. Then, after Campbell declared on the phone to Lavassani that the CPD officers were shutting down the store until a warrant was obtained, the officers remained just inside the entrance or outside the store. In effect, the CPD officers secured the store until the search warrant was obtained. Accordingly, the court concludes that the individual defendants are entitled to summary judgment on Blue Sea and LP's Section 1983 claims for violation of the corporate entities' rights under the Fourth Amendment.

### 2. Lavassani

Lavassani claims that his Fourth Amendments rights were violated based upon his alleged unlawful arrest, the excessive force used during that arrest, and the malicious prosecution that followed the arrest. Each of the individual defendants filed a motion for summary judgment [Doc. Nos. 66, 69, 75, and 76]. In the briefs in support of their motions, essentially the same arguments are presented. First, the individual defendants argue that there was no violation of the plaintiffs' Fourth Amendments rights. Next, they contend that they are entitled to qualified immunity because "arguable probable cause" existed for the warrantless arrest of Lavassani for obstruction of justice. Finally, the individual defendants contend that the existence of probable cause for the arrest defeats Lavassani's claim for malicious prosecution.

#### a. Unlawful Arrest and Excessive Force

The individual defendants are entitled to qualified immunity if their conduct "does not violate clearly established statutory and constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). In fact, "qualified immunity applies unless application of the standard would inevitably lead every reasonable officer [in the defendants' position] to conclude the [arrest or] force was unlawful." *Post v. City of Fort Lauderdale,* 7 F.3d 1552, 1559 (11th Cir.1993). Once an officer or official raises the defense of qualified immunity, the burden of persuasion as to that issue is on the plaintiff. *See Suissa v. Fulton County,* 74 F.3d 266, 269 (11th Cir.1996).

In this case, because the individual defendants were engaged in "discretionary functions" when they arrested Lavassani, *see Holloman ex rel. Holloman v. Harland,* 370 F.3d 1252, 1265 (11th Cir.2004) (defining the inquiry as considering whether the official engaged in acts "of a type

that fell within the employee's job responsibilities"), the burden shifts to Lavassani to demonstrate that (1) the defendants violated his federal constitutional or statutory rights and that (2) those rights were clearly established at the time they acted. *Vinyard v. Wilson*, 311 F.3d 1340, 1350 (11th Cir.2002). Therefore, the court must determine whether Lavassani's version of the facts demonstrates an unlawful arrest and that the use of force was excessive in violation of the Fourth Amendment.

■ The individual defendants arrested Lavassani without a warrant for misdemeanor obstruction of justice. O.C.G.A. § 16–10–24(a). "A warrantless arrest without probable cause violates the Constitution and provides a basis for a section 1983 claim, but the existence of probable cause at the time of arrest ... constitutes an absolute bar to a section 1983 action for false arrest." *Case v. Eslinger*, 555 F.3d 1317, 1326–27 (11th Cir.2009). And, while the use of force below a de minimis threshold during an arrest ordinarily will not be actionable, *see Vinyard*, 311 F.3d at 1348 n. 13, "even de minimis force will violate the Fourth Amendment if the officer is not entitled to arrest or detain the suspect." *Zivojinovich v. Barner*, 525 F.3d 1059, 1071 (11th Cir.2008).

■ While an arrest without probable cause is unconstitutional, the officers who make such an arrest are entitled to qualified immunity if there was "arguable probable cause" for the arrest. *Kingsland v. City of Miami*, 382 F.3d 1220, 1232 (11th Cir.2004). Therefore, in order for immunity to apply, "an officer need not have actual probable cause but only 'arguable probable cause,' i.e., the facts and circumstances must be such that the officer reasonably could have believed that probable cause existed." *Montoute v. Carr*, 114 F.3d 181, 184 (11th Cir.1997). "The inquiry is not whether probable cause actually existed, but instead whether an officer reasonably could have believed that probable cause existed, in light of the information the officer possessed." *Id.*; *Von Stein v. Brescher*, 904 F.2d 572, 579 (11th Cir.1990). Finally, whether a set of facts establishes arguable probable cause for an arrest depends on the elements of the crime involved, as defined by state law. *Crosby v. Monroe County*, 394 F.3d 1328, 1333 (11th Cir.2004).

■ Under Georgia law, "[e]xcept as otherwise provided in [O.C.G.A. § 16–10–24(b) ], a person who knowingly and willfully obstructs or hinders any law enforcement officer in the lawful discharge of his official duties is guilty of a misdemeanor." O.C.G.A. § 16–10–24(a). Under the facts of this case construed in favor of Lavassani, the court concludes that no reasonable officer could have believed that probable cause existed to arrest Lavassani for violation of O.C.G.A. § 16–10–24(a). *See Reese v. Herbert*, 527 F.3d 1253, 1272 (11th Cir. 2008). In other words, no reasonable officer could have believed that probable cause existed to arrest Lavassani for "knowingly and willfully obstruct[ing] or hinder[ing] any law enforcement officer in the lawful discharge of his official duties" on the night of May 1–2, 2008. *Id.*

First, when they talked to Lavassani on the phone, both Campbell and Jones expressed the CPD's need for access to the videotape and directed Lavassani to come to the Shell station in order to allow such access. In fact, Jones threatened that Lavassani would be arrested if he did not come to the store. After directing and threatening Lavassani on the telephone, Jones, Campbell, and other CPD officers then stood inside of the Shell station and discussed various scenarios and plans for both arresting and injuring (or hurting)

Lavassani.[33] In fact, Woldeyohanes heard the officers talk about these plans and specifically warned Lavassani of those plans when the store owner arrived at the Shell station. Further, upon arrival at the store, Lavassani indicated through his actions that he wanted to assist the officers by providing the videotape. Then, on two different occasions, Rivas specifically directed Lavassani to enter the store.[34] Despite the fact that Jones heard Rivas' directive and knew that Rivas was going to escort Lavassani, Jones, who repositioned himself between the store's entrance and Lavassani on more than one occasion, was determined to execute the stated plan to arrest and "get a lick in" on Lavassani. Evidence of the plan is further supported by the fact that Johnson opened the backdoor of his police car at approximately the same time that Jones made his outburst and declaration that he was "going to take over this god damn mother fucking thing."

The facts, taken in a light most favorable to the non-movant, *Skop v. City of Atlanta,* 485 F.3d 1130, 1138–39 (11th Cir. 2007), show that from the time of the telephone calls from the CPD officers until his arrest, Lavassani did not impede or hinder any of the officers in the performance of their duties. In sum, Lavassani executed and complied with every directive that a CPD officer issued on the night of May 1–2, 2008:(1) Lavassani drove 25 miles from his home to the Shell station in the middle of the night as directed; (2) he attempted to provide the videotape as di-

rected; and, (3) he walked towards the entrance of the store under escort as directed. Based upon these facts, the court concludes that arguable probable cause did not exist to arrest Lavassani for violation of O.C.G.A. § 16–10–24(a). Accordingly, the court finds that the individual defendants are not entitled to qualified immunity and denies their motion for summary judgment on Lavassani's Section 1983 claims of violation of his Fourth Amendment Rights for false arrest and excessive force.

### b. Malicious Prosecution

In the complaint [Doc. No. 1, ¶ 51], Lavassani claims that "Yarbrough and the other defendants" are liable under Section 1983 for malicious prosecution. However, in the his response to the motion for summary judgment, Lavassani presents evidence to support liability only for malicious prosecution against Yarbrough and Jones.[35] Accordingly, the court considers only the malicious prosecution claim under Section 1983 against those two defendants.

"To prove a § 1983 malicious prosecution claim, under federal law and Georgia law, a plaintiff must show the following: (1) a criminal prosecution instituted or continued by the present defendant; (2) with malice and without probable cause; (3) that terminated in the plaintiff accused's favor; and (4) caused damage to the plaintiff accused." *Kjellsen v. Mills,* 517 F.3d 1232, 1237 (11th Cir.2008). Furthermore, the United States Supreme

---

**33.** As detailed in the Part I (Factual Background) above, Jones stated at various times that he wished he had spray or even a taser. Then, he told the other officers to let him handle Lavassani upon arrival and that he was going to "get a lick in on him." Meanwhile, other unidentified officers discussed hatred towards Lavassani and declared that "its going to be bad" when Lavassani arrives.

**34.** In fact, Rivas first directed Lavassani verbally loud enough that everyone outside heard and then again by eye contact and head gesture.

**35.** Specifically, Lavassani claims that Yarbrough, under Jones's directive, issued four falsely sworn arrest warrants that stated Lavassani "fought" against the officers during the arrest.

Court has held that an officer may be liable under § 1983 if he seeks a warrant where "a reasonably well-trained officer ... would have known that his affidavit failed to establish probable cause and that he should not have applied for the warrant." *Malley v. Briggs,* 475 U.S. 335, 345, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986); *see also Kelly v. Curtis,* 21 F.3d 1544, 1553 (11th Cir.1994).

Yarbrough and Jones argue that they are entitled to qualified immunity as to Lavassani's Section 1983 malicious prosecution claim. However, as discussed above, the individual defendants are not entitled to qualified immunity because of the lack of "arguable probable cause." Furthermore, the facts, as presented by Lavassani, show that Yarbrough, under the direction of Jones, falsely swore that Lavassani had fought with the officers on the night of May 1–2, 2008, in order to support the arrest warrant for obstruction. Based upon the video evidence in this case, Yarbrough and Jones knew that the store owner did not actively fight with the CPD officers. Therefore, the court denies Jones and Yarbrough's motion for summary judgment regarding Lavassani's Section 1983 malicious prosecution claim.

### E. State Law Claims

In addition to the multiple claims made in Count I under Section 1983, the plaintiffs assert several state law claims against the defendants. Prior to addressing each of the plaintiffs' state law claims, the court will review applicable law and standards for municipal liability and official immunity under the laws of Georgia.

### 1. Municipal Liability

Under O.C.G.A. § 36–33–1, a city or municipality in Georgia "is not liable for the negligence or misconduct of its officers in the performance of governmental functions," *City of Atlanta v. Fry,* 148 Ga.App. 269, 251 S.E.2d 90 (1978),[36] but may be liable for negligence or misconduct of its officers in the performance of proprietary or ministerial functions. *Rutherford v. DeKalb County,* 287 Ga.App. 366, 651 S.E.2d 771, 772 (2007). In this regard, it is well established that city police officers engaged in city police work are performing a governmental function to which this waiver of a city's sovereign immunity does not apply.[37] Therefore, regardless of whether the individual defendants acted negligently or recklessly or for that matter with actual malice, the City has sovereign immunity as to their actions in carrying out police duties unless some other waiver applies. *Weaver v. City of Statesboro,* 288 Ga.App. 32, 653 S.E.2d 765, 768 (2007). In this case, the plaintiffs do not assert that any waiver applies. Accordingly, the court grants the City of Canton's motion for summary judgment regarding all of the plaintiffs' state law claims.

### 2. Police Officer Liability

The Georgia Constitution provides that state officers and employees "may be liable for injuries and damages if they act with actual malice or with actual intent to cause injury in the performance

36. *See Williams v. Solomon,* 242 Ga.App. 807, 531 S.E.2d 734, 737 (2000) (regarding governmental functions, "the City would not be liable even if [the police officer] had committed an intentional tort").

37. *See* O.C.G.A. § 36–33–3 ("municipal corporation shall not be liable for the torts of policemen or other officers engaged in the

discharge of the duties imposed on them by law"); *Carter v. Glenn,* 249 Ga.App. 414, 548 S.E.2d 110, 113 (2001) ("[t]he operation of a police department ... is a discretionary governmental function of the municipality as opposed to a ministerial, proprietary, or administratively routine function").

of their official functions." Ga. Const., art. I, § 2, ¶ IX(d); *see Bashir v. Rockdale County,* 445 F.3d 1323, 1333 (11th Cir. 2006). And since *Gilbert v. Richardson,* 264 Ga. 744, 452 S.E.2d 476 (1994), the Supreme Court of Georgia "has applied the same standard of liability for the discretionary acts of city employees as for the acts of county employees." *Cameron v. Lang,* 274 Ga. 122, 549 S.E.2d 341 (2001). In the context of official immunity under Georgia law, "actual malice requires deliberate intention to do wrong and denotes express malice or malice in fact." *Adams v. Hazelwood,* 271 Ga. 414, 520 S.E.2d 896 (1999). Moreover, actual malice does not include implied malice, or the reckless disregard for the rights and safety of others. *Murphy v. Bajjani,* 282 Ga. 197, 647 S.E.2d 54 (2007). "A deliberate intention to do wrong such as to constitute actual malice necessary to overcome official immunity must be in the intent to cause the harm suffered by the plaintiffs." *Selvy v. Morrison,* 292 Ga.App. 702, 665 S.E.2d 401, 405 (2008) (citations omitted).

#### a. Lance and Vande Zande

The plaintiffs do not assert that Lance or Vande Zande acted with actual malice on the night of May 1–2, 2008, in either the complaint [Doc. No. 1] or the response to the motion for summary judgment [Doc. No. 92]. Therefore, the court concludes that Lance and Vande Zande are entitled to qualified immunity as provided by the Georgia Constitution and thus grants their motion for summary judgment regarding the state law claims.

#### b. Individual Defendants

██ As to the officers that arrested him, Lavassani asserts that the individuals defendants acted with actual malice on the night of May 1–2, 2008. In order for the individual defendants to be held personally liable, the Georgia Constitution requires that the plaintiffs show that those defendants acted with "actual malice" or "intent to cause the harm suffered by the plaintiffs." *Selvy,* 665 S.E.2d at 405. In this case, the court concludes that there is a jury question concerning whether the officers had actual malice toward or an actual intent to injure Lavassani. As discussed above in Part I (Factual Background) and Part V, Paragraph (D.)(2.)(a.), the individual officers expressed their disgust and hatred towards Lavassani while inside the Shell station, and they openly discussed their plans for injuring and arresting the store owner while they waited from him to arrive. Then, upon Lavassani's arrival, Campbell attempted to instigate a physical altercation by getting in Lavassani's face, and, thereafter, the individual defendants, led by Jones, executed their plan to arrest and injure Lavassani despite their knowledge that Rivas had directed the store owner to enter the Shell station to obtain the videotape. Accordingly, the court concludes that the individual defendants are not entitled to official immunity.

#### 3. Count II: Assault and Battery

██ Under Georgia law, "[a] physical injury done to another shall give a right of action to the injured party, whatever may be the intention of the person causing the injury, unless he is justified under some rule of law." O.C.G.A. § 51–1–13. Another statute provides, "[a]ny violent injury or illegal attempt to commit a physical injury upon a person is a tort for which damages may be recovered." O.C.G.A. § 51–1–14. The facts of this case, taken in a light most favorable to Lavassani, show that the individual officers injured the store owner during his arrest. Moreover, the court has already concluded that there the individual defendants lacked arguable probable cause for the arrest and there is a question of fact whether they were acting with actual

malice." Accordingly, the court denies the individual defendants' motions for summary judgment regarding Lavassani's assault and battery claim.

### 4. Count III: Civil Conspiracy

In Count III, Lavassani claims that the defendants are liable for civil conspiracy. More specifically, Lavassani asserts that the individual defendants conspired to commit the assault and battery. A conspiracy is a combination of two or more persons to accomplish an unlawful end or to accomplish a lawful end by unlawful means. *Mustaqeem–Graydon v. SunTrust Bank*, 258 Ga.App. 200, 573 S.E.2d 455, 461 (2002) (citations omitted). To recover damages for a civil conspiracy claim, a plaintiff must show that two or more persons, acting in concert, engaged in conduct that constitutes a tort. *Id.* Absent the underlying tort, there can be no liability for civil conspiracy. *Id.* Here, Lavassani has presented video evidence that could support a claim that the individual defendants acted in concert and engaged in assault and battery, which constitutes a tort. Therefore, the court denies the individual defendants' motions for summary judgment on Lavassani's claim for civil conspiracy.

### 5. Count IV: False Arrest

In Count IV, Lavassani claims that the individual defendants are liable for false arrest and imprisonment. To prevail on a claim of false arrest under Georgia law, a plaintiff must show both the presence of malice and the absence of probable cause. O.C.G.A. § 51–7–1; *see McKissick v. S.O.A., Inc.*, 299 Ga.App. 772, 684 S.E.2d 24 (2009). As previously discussed in this order, the court has concluded that the individual defendants lacked

arguable probable cause to arrest Lavassani. *Compare McNeely v. Home Depot*, 275 Ga.App. 480, 621 S.E.2d 473, 475 (2005) (defining probable cause under Georgia law) *with United State v. Jimenez*, 780 F.2d 975, 978 (11th Cir.1986) (defining arguable probable cause). Moreover, if there was no arguable probable cause, it necessarily follows that there was no probable cause. Finally, the court has determined that there is a question of fact whether the individual defendants acted with malice. Therefore, the court denies the individual defendants' motions for summary judgment on Lavassani's false arrest claim.

### 6. Count V: Malicious Prosecution

In Count V, Lavassani claims that Yarbrough and Jones are liable for malicious prosecution.[38] "A criminal prosecution which is carried on maliciously and without any probable cause and which causes damage to the person prosecuted shall give him a cause of action." O.C.G.A. § 51–7–40. In order to state a claim for malicious prosecution in Georgia, a plaintiff must show: (1) prosecution for a criminal offense; (2) instigated without probable cause; (3) with malice; (4) under a valid warrant, accusation or summons; (5) which has terminated favorably to the plaintiff; and (6) has caused damage to the plaintiff. *Medoc Corp. v. Keel*, 166 Ga. App. 615, 305 S.E.2d 134 (1983).

Here, the facts advanced by Lavassani show that Yarbrough, under the direction of Jones, falsely swore that Lavassani had fought with the officers on the night of May 1–2, 2008, in order to support the arrest for obstruction. Moreover, the video evidence supports Lavassani position that Yarbrough and Jones knew that La-

---

**38.** As explained in Part V, Paragraph (D.)(2.)(b.), Lavassani produced evidence to support malicious prosecution claims against only Yarbrough and Jones.

vassani did not fight with the CPD officers.[39] Moreover, the court has already concluded that arguable probable cause did not exist for the arrest and there is a question of fact whether Jones and Yarbrough acted maliciously in prosecuting Lavassani for obstruction. Accordingly, the court denies Jones and Yarbrough's motions for summary judgment on Lavassani's claim for malicious prosecution.

### 7. Count VI: Trespass to Real Property

■ In Count VI, the plaintiffs allege that the defendants are liable for trespass to real property. "The right of enjoyment of private property being an absolute right of every citizen, every act of another which unlawfully interferes with such enjoyment is a tort for which an action shall lie." O.C.G.A. § 51–9–1. Thus, the cause of action for trespass to property requires an unlawful interference. Under Georgia law, a state officer does not commit trespass when he acts within the scope of his official duties. *See Morton v. McCoy*, 204 Ga. App. 595, 420 S.E.2d 40 (1992). In this case, the individual defendants were acting within the scope of the official duty as police officers when they entered the Shell station. Furthermore, after the officers removed Woldeyohanes, the CPD officers secured the property and remained in their official capacity. Therefore, the individual defendants were in their official capacity throughout their time in and around the Shell station. Accordingly, there is no question of fact regarding the issue of trespass to real property, and the individual defendants are entitled to summary judgment on the plaintiffs' trespass to property claim.

### 8. Count VII: Trespass to Personalty

In Count VII, the plaintiffs allege that the individual defendants are liable for trespass to personalty. O.C.G.A. § 51–10–3 provides, "[a]ny unlawful abuse of or damage done to the personal property of another constitutes a trespass for which damages may be recovered." However, as discussed above in Part V, Paragraph (D.)(1.), the plaintiffs have failed to provide any evidence to support a claim for trespass to personalty. Campbell was given permission to fix a fountain drink, and there is no evidence to support a claim that money was taken or stolen. Accordingly, the court concludes that there is no issue of fact regarding the claim for trespass to personalty, and the individual defendants are entitled to summary judgment on the plaintiffs' trespass to personally claim.

### 9. Counts VIII & IX against City Defendants

In Count VIII (negligence) and Count IX (vicarious liability), the plaintiffs contend that the City Defendants were negligent in the way they performed certain acts and that some defendants were liable for the actions of others on the theory of *respondeat superior.* However, as discussed above in Part V, Paragraphs (E.)(1.) and (E.)(2.)(a.), the City Defendants are entitled to summary judgment on all of the plaintiffs' state law claims.

### 10. Count X: Georgia Open Records

In Count X, the plaintiffs claim that all of the defendants are liable for violation of the Georgia Open Records Act ("GORA"), O.C.G.A. § 50–18–70. As an initial matter, the court notes that the plaintiffs' response briefs do not address the defendants' motions for summary judgment on this claim.

---

**39.** If an individual provides information he knew was false and which urges a law enforcement official to begin criminal proceedings, that individual can be liable for malicious prosecution. *Melton v. LaCalamito,* 158 Ga.App. 820, 282 S.E.2d 393, 396 (1981).

Moreover, the plaintiffs fail to explain why all of the named defendants are liable under GORA. Finally, based upon the plaintiffs' evidence presented in opposition to the motions for summary judgment, the court concludes that the plaintiffs received the documents requested. Therefore, the court concludes that the plaintiffs have abandoned Count X of the complaint, and the court grants the defendants' motions for summary judgment with regard to the GORA claim.

## VI. Conclusion

For the reasons set forth above, the court hereby GRANTS the City Defendants' motion for summary judgment [Doc. No. 74] and DENIES in part and GRANTS in part the individual defendants' motions for summary judgment [ Doc. Nos. 66, 69, 75, and 76]. Specifically, the court grants the individual defendants' motion for summary judgment as to: all of Blue Sea and LP's claims; Lavassani's claims under Section 1983 for violation of his Fourteenth Amendment Rights; and, Lavassani's state law claims in Counts VI (Trespass to Real Property), VII (Trespass to Personalty), and X (Georgia Open Records Act). Additionally, the court grants Combs and Campbell's motion for summary judgment as to Lavassani claims under Section 1983 for violation of his Fourth Amendment Rights for malicious prosecution and state law claim for malicious prosecution.

The court denies the individual defendants' motions for summary judgment as to Lavassani's claims under Section 1983 for violation of his Fourth Amendment Rights against unlawful arrest and excessive force. Also, the court denies Jones and Yarbrough's motion for summary judgment as to Lavassani's claim under Section 1983 for violation of his Fourth Amendment Rights against malicious pros-

ecution and state law claim for malicious prosecution. Finally, the court denies the individual defendants motion for summary judgment as to Lavassani's state law claims for assault and battery (Count II), civil conspiracy (Count III), and false arrest (Count IV).

To summarize the court's ruling, Lavassani is the only remaining plaintiff, and Jones, Campbell, Yarbrough, and Combs are the only remaining defendants. Further, Lavassani's remaining claims consist of:

— Count I (Section 1983 claim for false arrest and excessive force) against all of the individual defendants;

— Count I (Section 1983 claim for malicious prosecution) against Jones and Yarbrough;

— Count II (state law claim for Assault and Battery) against all of the individual defendants;

— Count III (state law claim for Civil Conspiracy) against all of the individual defendants;

— Count IV (state law claim for False Arrest) against all of the individual defendants;

— Count V (state law claim for malicious prosecution) against Yarbrough and Jones.